JUDGE RAKOFF

**15 CV 03976**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, AXA INSURANCE COMPANY, and CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND LONDON MARKET COMPANIES SUBSCRIBING TO POLICY NUMBER B0823MA1402182 | CIVIL ACTION NO.: |
| Plaintiffs | COMPLAINT |
| v. | |
| CASTLETON COMMODITIES INTERNATIONAL LLC and CASTLETON COMMODITIES TRADING (CHINA) CO. LTD., | |
| Defendants | |



RECEIVED
MAY 22 2015
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Great American Insurance Company of New York, AXA Insurance Company, and Certain Underwriters at Lloyd's, London and London Market Companies subscribing to policy number B0823MA1402182, by and through their undersigned attorneys, as and for their Complaint for Declaratory Judgment, hereby allege as follows:

## THE PARTIES

1. At all times material hereto, Plaintiffs herein were and still are engaged in the business of providing marine and associated insurance coverage for cargo and goods pursuant to certain policy terms, conditions, exclusions, and limitations, as more fully set forth below.

2. Plaintiff Great American Insurance Company of New York ("Great

American") was and still is a corporation duly organized and existing under and by virtue of the laws of the State of New York, with a principal place of business in the State of Ohio.

3.      Plaintiff AXA Insurance Company ("AXA") was and still is a corporation duly organized and existing under and by virtue of the laws of the State of New York with a principal place of business in the City and State of New York.

4.      Great American and AXA issued the primary insurance policy at issue herein ("Primary Policy") and collectively are referred to as the Primary Insurers.

5.      Plaintiffs Certain Underwriters at Lloyd's, London and London Market Companies subscribing to policy number B0823MA1402182 ("Excess Policy"), are various insuring entities located, and conducting the business of insurance in, London, England. They collectively are referred to as the Excess Insurers.

6.      At all times material hereto, Defendants herein were and still are engaged in the business of trading various commodities, including but not limited to petroleum products, in various countries throughout the world, as more fully set forth below.

7.      Defendant Castleton Commodities International LLC ("CCI") was and still is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware with a principal place of business in the State of Connecticut.

8.      Defendant Castleton Commodities Trading (China) Co. Ltd. ("CCIC") was and still is a business entity duly organized and existing under and by virtue of the laws of a foreign state with a principal place of business in a foreign state, and, therefore, is a citizen or subject of a foreign state.

9.      CCIC is a subsidiary and/or an affiliate of CCI (collectively "Castleton").

10.     Upon information and belief, Castleton retained Aon Risk Services, Northeast,

Inc. (Aon), whose office is located in New York, to coordinate its insurance program, including the procurement of the insurance policies at issue herein.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to of 28 U.S.C. §1333(1) and Rule 9(h) of the Federal Rules of Civil Procedure, as this is a case of admiralty and maritime jurisdiction involving coverage under the terms and conditions of marine insurance policies.

12.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332, as there is complete diversity of citizenship between Plaintiffs and Defendants, and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

13.     The Excess Policy contains a forum selection provision providing for the exclusive jurisdiction of the Federal Courts of New York, and a choice of law provision providing for the application of the laws of the State of New York.

14.     This Court has personal jurisdiction over the parties and venue for the action is proper within this District.

## NATURE OF THE ACTION

15.     This is an action seeking a Declaratory Judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure and the Federal Declaratory Judgment Act, 28 U.S.C. §2201, to resolve and determine an actual controversy between the parties with respect to coverage under a Marine Cargo/Storage and War Risk Policy  and Excess Policy, as more fully set forth below.

## FACTUAL BACKGROUND

### A.     The Marine Cargo/Storage and War Risk Policy

16.     In 2011, Aon was the insurance broker of record for Louis Dreyfus Highbridge Energy LLC (LDHE), a company engaged in trading crude oil and refined petroleum products, among other commodities.

17.     Aon approached the market, including Great American and AXA, for the placement of primary marine cargo, storage and war risk coverage for LDHE.

18.     Subsequently, Great American and AXA provided quotes and LDHE directed Aon to bind the coverage.

19.     Aon issued a binder for coverage commencing on March 1, 2012, and thereafter provided an Aon manuscript policy, specifically a Marine Open Cargo Policy with Endorsements.

20.     Endorsement No. 2 provided coverage for Storage & Inland Transit, and stated in pertinent part:

> In consideration of marine premium paid, as stated elsewhere herein, this policy is extended to cover goods and merchandise as per Clause 4 of this policy, while temporarily stored in any location… subject to the following terms and conditions.
>
> * * *
>
> 7.  Exclusions
>
> * * *
>
> Loss or damage to goods and merchandise caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Assured or other party of interest, his or their employees or agents.

21.     The Primary Policy was executed by the underwriters for Great American and AXA in New York, and was issued in New York.

22.     Aon also approached the market to procure excess coverage for LDHE.

23.     Upon information and belief, LDHE directed Aon to bind the excess coverage in the London market.

24.     Thereafter, a Contract of Insurance for excess coverage for the term commencing was issued on March 1, 2012.

25.     In or about October 2012, LDHE announced that it was being sold to two investor groups and that the name of the new company would be Castleton Commodities International LLC.

26.     The Primary Insurers issued Endorsement No. 5 to substitute Castleton Commodities International LLC as the named insured, effective December 31, 2012.

27.     The Primary Policy was renewed for the March 1, 2014 to March 1, 2015 policy term. (See Exhibit 1.)

28.     The Excess Policy was renewed for the March 1, 2014 to February 28, 2015 policy term. (See Exhibit 2.) The Excess Policy, in addition to its separate and distinct terms, incorporated many of the terms and conditions of the Primary Policy, including but not limited to Endorsement No. 2.

**B.     The Underlying Relationships**

29.     Upon information and belief, CCIC entered into contracts with Hangzhou Leiting Ltd. ("Leiteng") and Hangzhou Heavy Traffic Asphalt Co., Ltd. ("HTA") pursuant to which CCIC would purchase and import bitumen into China and resell that bitumen to Leiteng and HTA.

30.     Upon information and belief, on January 24, 2014, CCIC, as seller, and Leiteng, as buyer, entered into a "Bitumen Freight Forwarding Services and Storage Facilities Agreement" with Zhejiang Fukang Petrochemical Storage Co. Ltd. ("Fukang"), pursuant to

which Fukang agreed, among other things, to provide freight forwarder agency services to CCIC. (See Exhibit 3.)

31.     Upon information and belief, on March 25, 2014, CCIC, as seller, and Hangzhou Zhongjiao Asphalt Co., Ltd. (Zhongjiao) (an affiliate of HTA), as buyer, entered into a "Bitumen Freight Forwarding Services and Storage Facilities Agreement" with Fukang, pursuant to which Fukang agreed, among other things, to provide freight forwarder agency services to CCIC. (See Exhibit 4.)

32.     CCIC entered into three Purchase Agreements with Leiteng:

- No. 40101S dated January 28, 2014 for 20,000 MT; (See Exhibit 5.)
- No. 40301S dated March 4, 2014 for 30,000 MT; (See Exhibit 6.)
- No. 40623 dated June 23, 2014 for 35,000 MT; (See Exhibit 7.)

33.     CCIC entered one Purchase Agreement with HTA: No. 40302S dated March 25, 2014 for 25,000 MT. (See Exhibit 8.)

34.     Pursuant to the first two Purchase Agreements with Leiteng and the Purchase Agreement with HTA, the buyers were required to make a ten percent deposit, and were required to pay the balance of the individual purchase prices and take delivery of the bitumen within 180 days of the date of each specific sales contract for each bitumen lot.

35.     Pursuant to the third Purchase Agreement with Leiteng, it was required to pay the duty and VAT as a deposit, and to pay the balance of the individual purchase prices and take delivery of the bitumen within 90 days of the dates that CCIC opened the letters of credit for the upstream purchase of each bitumen lot.

C.     **The Bitumen Transactions**

36.     Upon information and belief, pursuant to the terms of the aforementioned

Purchase Agreements, CCIC entered into 19 specific sales contracts with Leiteng and 4 with HTA between February 2014 and August 2014.

37.     Upon information and belief, CCIC purchased bitumen on the market and arranged for shipment to Fukang, which shipments were made between February 3 and September 11, 2014.

38.     Upon information and belief, CCIC imported a total of 106,800.19 MT of bitumen and delivered same to Fukang.

39.     Leiteng reportedly paid for and took delivery of 19,398.437 MT of bitumen in four lots on July 26, September 3, and September 15, 2014.

40.     Leiteng reportedly paid for an additional 3,798.77 MT of bitumen, but did not take delivery of the bitumen.

41.     Pursuant to the terms of the Purchase Agreements, title to the bitumen shifted to the buyer upon full payment.

42.     Pursuant to the terms of the Purchase Agreements, Leiteng and HTA were required to pay the full purchase price for the bitumen and take delivery within 180 days or 90 days of the trigger date contained in the applicable Agreements.

43.     CCI recently provided the Primary Insurers and Excess Insurers with a document which purports to extend for 30 days the time for Leiteng to pay for and take delivery of the bitumen identified to Purchase Agreement Nos. 40101S and 40301S.

44.     Upon information and belief, Leiteng failed to make any of the balance payments toward the full purchase price for 6 lots within the time frame set forth in the Purchase Agreements or the purported extension.

45.     Upon information and belief, HTA failed to make any of the balance payments

toward the full purchase price for 4 lots within the time frame set forth in the Purchase Agreements.

46.     Upon information and belief, CCIC did not demand payment from Leiteng or HTA for any of these 10 lots.

47.     Pursuant to the Bitumen Freight Forwarding Services and Storage Facilities Agreement, CCIC's bitumen was supposed to be stored in separate storage tanks dedicated to CCIC. Upon information and belief, Fukang commingled the bitumen, but reported to CCIC that it was stored separately. Fukang also reported to CCIC that the full inventory of bitumen was in place.

48.     Pursuant to the Bitumen Freight Forwarding Services and Storage Facilities Agreement, the risk of loss shifted to Fukang when the bitumen passed the flange at the ship's manifold and entered Fukang's pipelines, and remained with Fukang until it made delivery to CCIC's buyers.

**D.      The Bitumen Losses**

49.     Plaintiffs have been informed that on September 26, 2014, Filippo Duan, the bitumen trader for CCIC, suddenly became concerned that something had happened to the CCIC bitumen that was supposed to be in storage at the Fukang facility, but the reason for this concern remains unexplained.

50.     Apparently as a result of this concern, Duan spoke with his point of contact for Fukang, Ma Guangxiang, who reported that there was a shortage with respect to CCIC's bitumen.

51.     Upon information and belief, Duan then arranged to meet Ma on the afternoon of September 26th, with the intention that they would go together to the Fukang facility, but

reportedly they became lost and never made it to the facility that day.

52.     Upon information and belief, Duan and Ma were able to make their way to the Fukang facility on September 27th , and when they arrived, they saw tanker trucks lined up and taking deliveries of bitumen.

53.     Upon information and belief, the Chinese authorities were notified of the events taking place at the Fukang facility and they attended there on September 27, 2014, and suspended all activity at the facility. They also seized Fukang's computers and documents.

54.     Subsequently, the storage tanks at the Fukang facility were gauged and it was determined that they were empty.

55.     Castleton has reported that it should have had 87,401.711 MT of bitumen in the storage tanks at the Fukang facility. Castleton has claimed that the value of this bitumen is $61,481,807. [1]

56.     Fukang has admitted that CCIC's bitumen was delivered to third parties without the authorization of CCIC. (See Exhibit 9.)

57.     A court in China has found that Fukang delivered CCIC's bitumen to third parties without the authorization or approval of CCIC. (See Exhibit 10.)

## FIRST CLAIM FOR RELIEF
### (Coverage Excluded for Misappropriation Losses)

58.     The averments contained in paragraphs 1 – 57, inclusive, are incorporated by reference with the same force and effect as if fully set forth herein at length.

59.     On October 13, 2014, the Primary Insurers issued a reservation of rights letter that identified the misappropriation exclusion as a potential bar to coverage.

---

[1] The insurers dispute the amount of the claim, and have reserved all of their defenses under the policies. They rely upon and incorporate by reference their reservation of rights letters and declination letters.

60.     On April 23, 2015, CCI, through AON, presented a proof of loss to the Primary and Excess Insurers seeking payment in the amount of $61,481,807 for the misappropriated bitumen. This proof of loss is inflated because it does not apply warranted adjustments or deductions, including but not limited to non-refundable deposits from Leiteng and HTA, retained by CCI and/or CCIC.

61.     By letter dated May 22, 2015, the Primary Insurers notified CCI that they were denying coverage for the claim based on the misappropriation exclusion.

62.     By letter dated May 22, 2015, the Excess Insurers notified CCI that they were joining in the denial of coverage for the claim.

63.     Fukang knowingly delivered CCIC's bitumen to unauthorized third parties and/or permitted it to be taken by them.

64.     Fukang acted in concert with third parties to misappropriate CCIC's bitumen.

65.     Fukang knew, and/or had reason to know, that the third parties to whom CCIC's bitumen was being released were not entitled to receive the bitumen.

66.     Fukang has admitted that it misappropriated CCIC's bitumen, by delivering it to third parties without the authorization of CCIC.

67.     The Primary Policy and the Excess Policy by its terms, exclude coverage for:

> Loss or damage to goods and merchandise caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Assured or other party of interest, his or their employees or agents.

(See Exhibit 1, Endorsement No. 2, Storage & Inland Transit, Clause 7 – Exclusion.)

68.     Pursuant to the applicable law, and the services and responsibilities undertaken by Fukang under the Bitumen Freight Forwarding Services and Storage Facilities Agreement, Fukang was an "agent" of CCIC, within the scope of the misappropriation exclusion.

69.     Pursuant to the applicable law, and the services and responsibilities undertaken by Fukang under the Bitumen Freight Forwarding Services and Storage Facilities Agreement, Fukang was an "other party of interest" within the scope of the misappropriation exclusion.

70.     Plaintiffs' investigation regarding the circumstances of the alleged losses is ongoing and they reserve the right to amend this Complaint to include supplemental information and/or additional claims for relief based on facts that may be discovered.

71.     The bitumen losses claimed by Castleton were caused in whole or in part by Fukang's misappropriation, secretion, conversion, infidelity and/or as a result of other dishonest acts.

72.     An actual and justiciable controversy exists between the parties as to their respective rights and obligations under the Primary Policy and Excess Policy.

73.     Plaintiffs have no adequate remedy at law.

74.     No prior request for the relief herein sought has been made.

WHEREFORE, Plaintiffs Great American Insurance Company of New York, AXA Insurance Company, and Certain Underwriters at Lloyd's, London and London Market Companies subscribing to policy number B0823MA1402182, respectfully request that this Honorable Court enter a judgment as follows:

(1)     Declaring that Great American and AXA have no coverage obligation to Defendants with regard to their alleged losses because those losses are excluded from coverage under the terms of the Primary Policy.

(2)     Declaring that Certain Underwriters at Lloyd's, London and London Market Companies subscribing to policy number B0823MA1402182, have no coverage obligation to Defendants with regard to their alleged losses because those losses are excluded from

coverage under the terms of the Primary Policy, which is followed by the Excess insurers.

(3)    Awarding Plaintiffs, the Primary and Excess insurers, such other and further

relief as the Court deems just and proper.

Dated:  May 22, 2015

RUBIN, FIORELLA & FRIEDMAN, LLP          MATTIONI, LTD.

BY:                                      BY:
James Mercante (JM 4231)                 George R. Zacharkow (GRZ 7099)
Michael Stern (MS 9113)                  Attorneys for Great American Ins. Co.
Attorneys for Axa Insurance Company      399 Market Street, Suite 200
630 Third Avenue, 3rd Floor              Philadelphia, PA  19106
New York, NY  10017                      Phone: 215- 629-1600
Phone: 212- 953-2381                     Fax:  215-923-2227
Fax:  212-953-2462                       E-mail:  gzacharkow@mattioni.com
E-mail:  jmercante@rubinfiorella.com
         mstern@RubinFiorella.com


WHITE, FLEISCHNER & FINO, LLP


BY:
Benjamin A. Fleischner (BAF-7006)
Jonathan S. Chernow (JSC-7339)
Attorneys for Plaintiffs Certain Underwriters
at Lloyd's, London and London Market
Companies Subscribing to Policy Number
B0823MA1402182
61 Broadway, 18th Floor
New York, NY 10006
Phone: 646-520-4253
Fax: 212-487-9777
E-mail: BFleischner@WFF-LAW.com
        JChernow@WFF-LAW.com

# EXHIBIT LIST

1.  Primary Policy

2.  Excess Policy

3.  Agreement with Fukang and Leiteng

4.  Agreement with Fukang and Zhongjiao

5.  Purchase Agreement No. 40101S

6.  Purchase Agreement No. 40301S

7.  Purchase Agreement No. 40623

8.  Purchase Agreement No. 40302S

9.  Fukang Statement

10. Mediation Order

# Exhibit 1

*Aon Risk Services*

# Louis Dreyfus Highbridge Energy LLC
## 2200 Atlantic Street
## Stamford, CT  06902

### Marine Cargo/Storage & War Risk Policy



# TABLE OF CONTENTS

SECTION                                                                    PAGE

| | | |
|---|---|---|
| 1. | Assured | 1 |
| 2. | Loss Payee | 1 |
| 3. | Attachment & Cancellation | 1 |
| 4. | Goods Insured | 1 |
| 5. | Insurable Interest | 2 |
| 6. | Conveyances | 2 |
| 7. | Geographical Limits | 2 |
| 8. | U.S. Economic and Trade Sanctions Clause | 2 |
| 9. | Broker's Clause | 2 |
| 10. | Issuance of Certificates | 3 |
| 11. | Letter of Credit Clause | 3 |
| 12. | Declarations | 3 |
| 13. | Errors & Omissions | 3 |
| 14. | Excess Insurance | 3 |
| 15. | Premiums | 3 |
| 16. | Inspection of Records | 4 |
| 17. | Captions | 5 |
| 18. | Superseding Clause | 5 |
| 19. | Valuation | 5 |
| 20. | Foreign Currency | 5 |
| 21. | Limits of Liability | 6 |
| 22. | Accumulation Clause | 6 |
| 23. | Commodity Insuring Conditions | 6 |
| 24. | Loading Survey | 11 |
| 25. | Return Freight Cost (US Shipments Only) | 11 |
| 26. | Perils Clause | 12 |
| 27. | Vermin Damage | 12 |
| 28. | Quarantine | 12 |
| 29. | Sorting, Segregation, Etc. | 12 |
| 30. | Commingled Cargo (Other than raw sugar) | 12 |
| 31. | FPA (EC) | 12 |
| 32. | Sue & Labor Clause | 12 |
| 33. | Recoopering | 13 |
| 34. | Limited Rejection Coverage | 13 |
| 35. | Destruction Clause | 13 |
| 36. | Inchmaree Clause | 13 |
| 37. | Explosion Clause | 13 |
| 38. | Fumigation Clause | 13 |
| 39. | Shore Clause | 14 |
| 40. | Warehousing, Forwarding Charges | 14 |
| 41. | Craft Clause | 14 |
| 42. | General Average Clause | 14 |
| 43. | Both to Blame Collision Clause | 14 |

44. Carrier Clause .................................................................................................... 15
45. Negligence Clause ............................................................................................. 15
46. Waiver and/or Release Clause ........................................................................... 15
47. Fraudulent Bills of Lading .................................................................................. 15
48. Machinery Clause ............................................................................................... 15
49. Labels Clause ..................................................................................................... 16
50. Brand or Trademarks Clause ............................................................................. 16
51. Control of Damaged Goods ................................................................................ 16
52. Concealed Damage ............................................................................................ 16
53. Demurrage Charges ........................................................................................... 16
54. Debris Removal .................................................................................................. 17
55. Extra Expense .................................................................................................... 17
56. Expediting Expenses .......................................................................................... 17
57. Shipping Expense Clause ................................................................................... 17
58. Overdue Means of Conveyance ......................................................................... 17
59. Loading/Unloading ............................................................................................. 18
60. Recoopering/Repacking ..................................................................................... 18
61. Shortage from Container .................................................................................... 18
62. Insufficiency of Packaging .................................................................................. 18
63. Deliberate Damage - Pollution Hazard ............................................................. 18
64. Customs Clause ................................................................................................. 19
65. Duty .................................................................................................................... 19
66. Other Insurance ................................................................................................. 19
67. FC&S Warranty (April 3, 1980) .......................................................................... 21
68. SR&CC Warranty (April 3, 1980) ....................................................................... 21
69. AIMU ................................................................................................................... 22
70. EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE ........... 22
71. FOB/FAS ............................................................................................................ 23
72. Unpaid Vendors ................................................................................................. 23
73. Seller's Interest .................................................................................................. 24
74. Guarantee Of Collectibility/DIC ......................................................................... 24
75. Increased Value Insurance ................................................................................ 25
76. Ex-Dock ............................................................................................................. 25
77. Purchases and Allocations of Shipments Afloat ................................................ 25
78. Sales and Allocations of Shipments Afloat ........................................................ 26
79. Consequential Loss ............................................................................................ 26
80. Warehouse to Warehouse & Marine Extension Clause ..................................... 26
81. Deviation ............................................................................................................ 27
82. Change of Destination/Deviation Delay Clause ................................................. 28
83. Voyage Tenure/ Duration of Coverage Clause .................................................. 28
84. Sight Draft Extension ......................................................................................... 28
85. Consolidation, Repacking and/or Breakdown (Excluding LNG) ......................... 29
86. Custom Storage ................................................................................................. 29
87. Refused/Returned Shipments ............................................................................ 29
88. Interruption of Transit of Damaged Goods ........................................................ 29
89. Loss of Market & Delay Clause .......................................................................... 30
90. Notice of Loss .................................................................................................... 30
91. Payment of Losses ............................................................................................ 30
92. Container Demurrage Charges ........................................................................... 30
93. Subrogation Clause ............................................................................................ 31

94.    Suit...........................................................................................................................31
95.    Constructive Total Loss..................................................................................31
96.    Partial Losses ..................................................................................................31
97.    Salvage Loss Clause.......................................................................................31
98.    Suit Time..........................................................................................................31

## *MARINE OPEN CARGO POLICY*

### *NO. JP 2012-3112*

### *OF THE VARIOUS INSURERS AS ATTACHED*

(Hereinafter referred to as this Company)

In consideration of premium paid or payable, as agreed does insure:

---

**GENERAL CONDITIONS**

---

1.  **Assured**

    Louis Dreyfus Highbridge Energy LLC and/or any affiliated subsidiary companies, corporate or otherwise, firms, trusts or joint ventures as may now or hereafter be constituted and/or any other entity of any nature of which the named Assured assumes active management.

    For account of whom it may concern.

2.  **Loss Payee**

    Losses payable to Assured or order.

3.  **Attachment & Cancellation**

    This policy to attach and cover all shipments made on and after March 1, 2012; and thereafter to be deemed continuous until cancelled by either party giving the ninety (90) days' written notice to that effect, but such cancellation shall not affect any risk on which this insurance has attached prior to the effective date of such notice.

4.  **Goods Insured**

    On all goods and/or merchandise and/or property of every description consisting principally of crude petroleum and refined petroleum products and liquefied petroleum gas, and/or liquefied natural gas and/or natural compressed gas resins, petrochemicals, coal, coke and petroleum coke; including prepaid freight and/or advanced freight and/or guaranteed freight "vessel lost or not lost" (under and/or On Deck) shipped by or to the Assured or by or to others for the Assured's account or control  or in which the Assured may have an interest; also to cover shipments for the account of others on which the Assured may receive instructions to insure provided such instructions are given prior to shipment or prior to any known or reported loss or accident; but excluding shipments bought or sold on terms whereby the Assured is not required to furnish insurance.

1

5. **Insurable Interest**

To cover all shipments made by or to the Assured for their own account as Principal, or as Agents for others and in which they have an insurable interest; or for the account of others from whom instructions to insure have been received prior to any known or reported loss, damage, or accident, and prior to arrival of vessel.

6. **Conveyances**

By metal self-propelled vessels (excluding sailing vessels, with or without auxiliary power, except as connecting conveyances); and/or barges; and/or land including pipeline and/or air conveyances and/or land and/or vessel storage; including shipments by mail and/or parcel post; and/or courier or package service; and all connecting conveyances, connecting conveyances to include messengers if and when required.

Note: Wherever the words "ship", "vessel", "seaworthiness", "shipowner" or "vessel owner" appear in the policy, they are deemed to include also the words "aircraft", "airworthiness", and "aircraft owner".

7. **Geographical Limits**

This policy covers all shipments, except to the extent coverage is prohibited by United States of America law or United States of America governmental decree, at and from ports and /or places in the world to and at ports and/or places in the world directly or via ports and/or places in any order, including the risk of transshipment by land, air, water, or otherwise, but including domestic shipments by pipeline, land conveyances and/or air, originating and terminating within any country or continent, and including shipments on the Great Lakes, inland waterways, coastwise and intercoastal including via the Panama Canal.

8. **U.S. Economic and Trade Sanctions Clause**

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but limited to, those sanctions administered and enforced by the U.S. Treasury Departments Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void. Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

9. **Broker's Clause**

It is a condition of this Policy, and it is hereby agreed that the Assured's Brokers, Aon Risk Services Northeast, Inc., shall be deemed to be exclusively the agents of the Assured and not of this Company. Any notice given or delivered by or on behalf of this Company to the said Brokers in connection with or affecting this insurance, or its cancellation, shall be deemed to have been delivered to the Assured.

10. **Issuance of Certificates**

Privilege is hereby granted the Assured to countersign this Company's certificates or special policies of insurance for any or all risks covered hereunder, it being agreed, however, that no certificate or policy shall be valid unless countersigned by an authorized representative of the Assured.

11. **Letter of Credit Clause**

Permission is also granted to the Assured to attach the London Institute Cargo Clauses (A, B and C) and War, Strikes, Riots and Civil Commotions Clauses dated 1/1/82 or other London or American Institute Clauses to policies and/or certificates of insurance where such clauses are required by the terms of sale, letter of credit or other banking requirements. Such clauses are deemed to be added to this policy in these instances.

The difference in conditions between such Institute Clauses and this policy are covered hereunder, additional premium, if any, to be agreed.

12. **Declarations**

It is a condition of this insurance that the Assured is bound to declare to Aon Risk Services Northeast, Inc., as brokers for the Assured, for transmission to this Company, as soon as practicable after the close of each policy year each and every shipment covered by this policy, whether arrived or not. If certificates and/or special policies of insurance have been issued, as per Clause 9, copies thereof should be attached to the declaration. This Company being bound to accept such declarations up to but not exceeding the limits agreed in this policy and subject to all its terms and conditions.

13. **Errors & Omissions**

This insurance shall not be prejudiced by any unintentional error, omission or delay in the remittance of copies of policies and/or certificates and/or declarations or by any unintentional error in the amount or the description of the interest, vessel or voyage or if the goods insured be shipped by another vessel or conveyance; provided prompt notice be given this Company as soon as said facts become known to the Assured's Insurance Department.

14. **Excess Insurance**

The Assured is permitted to place "excess insurance" over the limit of liability set forth in this policy and/or to place separate insurance on shipments and storage risks that would otherwise fall under the policy deductible. The existence of the other insurance shall not prejudice the coverage provided under this policy nor will it reduce any limit of liability hereunder.

15. **Premiums**

It is hereby understood and agreed that in consideration of a Gross Marine Cargo Minimum and Deposit premium of $30,000 for the period March 1, 2012 to March

1, 2013 and each year thereafter, the Assured warrants to maintain a complete and accurate record of all shipments covered hereunder and within thirty days (30) days of the end of each policy year report to these Assurers the insured values and the earned premium will be determined subject to the rates as set forth elsewhere in this policy.

It is further agreed that in consideration of the extension of coverage as set forth in Endorsement No. 2 of this policy the Assured agrees to an annual Minimum and Deposit Premium of $200,000 which will be adjusted based upon a rate of .11% per annum (including full TRIA coverage for transit and storage per Endorsement 2) against the average monthly values at risk per location as reported by the Assured.

These Assurers, or their agents, shall have the privilege, at any time during business hours to inspect the records of the Assured as respects shipments coming within the terms of this Policy.

Losses, if any, to be payable in accordance with the valuation clauses contained elsewhere in this Marine Open Cargo Policy.

It is further understood and agreed that the waiver of declarations of individual shipments shall not apply to shipments to or from "On Application" countries. Such shipments insured hereunder at Gross additional War rates to be agreed.

This policy represents one hundred percent interest in the insurance described herein. It is hereby understood and agreed that the Co-Insurers as set forth in this policy participate on a proportional basis in the limits of insurance provided by the policy in accordance with the percentage indicated. This being a policy with Co-Insurers, it is understood and agreed that participating Underwriters agree to follow the lead Underwriter with respect to underwriting and claims. In the event of loss or damage which may give rise to claim hereunder, Co-Insurers shall be bound by the decision and action of the Lead Underwriter who will investigate, settle, compromise, discharge or repudiate all claims hereunder and Co-Insurers shall in all respects follow the fortunes of the Lead Underwriter. It is understood and agreed that any salvage or recovery shall be divided between the Co-Insurers in the same proportion as each Co-Insurer's participation in the policy.

It is understood and agreed that unless otherwise noted elsewhere in this policy the premium assessed under this policy for primary risks is deemed to also be the consideration for the contingent coverages.

Aon commission rate to be 15%.

16. **Inspection of Records**

This Company, or its agent, shall have the privilege at any time during business hours to inspect the records of the Assured as respects shipments coming within the terms of this Policy. This company agrees to give the Assured a minimum 7-day written notification of their intent to exercise this privilege. This privilege expires twelve (12) months after final termination of this policy.

17. **Captions**

The Captions to the Clauses set forth herein are for reference purposes only and shall not be deemed to form part of this policy.

18. **Superseding Clause**

The clauses and warranties contained in this form shall override anything that may be at variance or contradictory thereto in the Policy to which this form is attached, except such clauses required by law.

## VALUATION

19. **Valuation**

Goods and/or merchandise and/or property insured hereunder except as specifically set forth within the commodity sections contained clause 23 are valued at:

Shipments that are sold:

Amount of invoice, including all charges therein; including any prepaid and/or advanced and/or guaranteed freight and insurance premiums paid or payable hereunder, if not included in the invoice; until declared and then at amount declared, provided such declaration is made prior to arrival and prior to any known or reported loss or accident but in no event to be less than the foregoing.

Shipments unsold:

Amount of Assured's purchase invoice including any freight not in the invoice, plus 10%, or, if applicable, the highest market value* at point of destination up to the date of arrival of carrying vessel or the date the vessel was due to arrive, plus 10 days excluding holidays and weekends.

(*) Note: Market value for the purposes of this insurance shall mean the market prices quoted by an accredited commodity publication or commodity exchange at or near the ports and/or place of insured destination.

Foreign currencies to be converted at bankers' sight rate of exchange applicable to each invoice and/or draft.

In the event the Assured receives written instructions for shipments to be valued on a basis differing from the above, the shipments involved are to be valued in accordance with such instructions, provided same are received by the Assured prior to arrival and prior to any known or reported loss or accident.

20. **Foreign Currency**

Privilege is granted the Assured to insure in foreign currencies, losses to be payable in the same funds and premium payable in United States Dollars at the rate of exchange current on the date of issuance of the certificate, special policy or declaration.

## LIMITS

**21. Limits of Liability**

These Assurers will not be liable for more than:

$30,000,000 in respect of goods on any one vessel or aircraft including pipeline and land conveyances and land or vessel storage, and per all connecting conveyance, or in any one place at any one time.

These Assurers do sublimit their liability in respect to the following:

$5,000,000 in respect of goods on deck of any one ocean vessel under On Deck Bill(s) of Lading. In the event, on Deck Bill(s) of Lading are issued without the Assured's knowledge or consent, the applicable vessel limit shall be $30,000,000.

$10,000,000 in respect of goods on any one barge other than as a connecting conveyance.

$25,000 in respect of goods in any one package transported by mail, express mail, parcel post.

**22. Accumulation Clause**

Should there be an accumulation of interest while in due course of transit beyond the limits expressed in this policy by reason of any interruption of transit and/or occurrence beyond the control of the Assured, or by reason of any casualty and/or at a transshipping point and/or on a connecting steamer or conveyance, this Company shall hold covered such excess interest and shall be liable for the full amount at risk, but in no event to exceed twice the policy limit, provided notice be given to this Company as soon as known to the Assured.

## CONDITIONS OF INSURANCE

**23. Commodity Insuring Conditions**

All shipments, unless otherwise specified in the named commodity sections, are insured:

Against all risks of physical loss or damage from any external cause irrespective of percentage, excepting those risks excluded by the F.C. & S. and S.R. & C.C. Warranties appearing elsewhere in this policy.

Including always the risks of jettison and/or washing overboard.

## SECTION I– LIQUID PETROLEUM GAS, CRUDE AND REFINED PETROLEUM PRODUCTS, PETROCHEMICALS

Shipments of the commodities set forth above in Bulk Are Insured:

Against all risks of physical loss or damage irrespective of percentage, excepting those risks excluded by the FC&S and SR&CC Warranties appearing elsewhere in this policy but coverage is extended to include leakage and/or shortage and/or difference in weight (or volume) and/or contamination, however arising.

Claims for leakage and/or shortage and/or difference in weight (or volume) however arising shall be payable only in excess of ordinary loss which shall be deemed to be one half of one percent (1/2%) calculated on each tank of the vessel or on the whole, at the option of the Assured, notwithstanding that craft may be used to effect delivery.

Warranted by the Insured that ship/barge tanks be cleaned, tested and approved prior to loading of cargo and a certificate therefore be given by a surveyor approved by there Insurers at port of loading.

Loading and discharge operations shall be supervised by recognized surveyors; the findings of such surveyors and where circumstances demand, the findings of Wharfingers and/or Sworn Chemists and/or Customs and/or Shore Installation Superintendents' Certificate(s) at ports of loading and/or discharge shall be accepted as proof of shipped and delivered quantities and qualities. However, Insurers hereunder agree to accept terminal figures of all terminals which have electric metering, as proof of shipped quantities.

Where it is standard practice for Bill of Lading figures to be based solely upon ship's figures and/or where a commercial transaction requires Bill of Lading quantities to be based solely upon ship's figures, Insurers agree to use the Bill of Lading figures so calculated for comparison with discharge figures and the calculation of claims. Bill of Lading figures (as per original or copy Bill of Lading) so calculated shall be binding on and acceptable to Insurers as proof of shipped quantities. Nevertheless, if loss occurs between shore tank and vessel which loss is reflected in the quantities shown in the Bills of Lading, such loss to be calculated by comparison between shore tank and Bill of Lading figures.

Claims for leakage and/or shortage and/or difference in weight (or volume) shall be assessed by a comparison of net shipped and net delivered weights or net shipped and net delivered volumes (as specified in the declaration of insurance or the ultimate Contract of Sale relevant to this insurance) based on 1952 or 1980 Tables, or other tables as agreed with the leading insurer (or any two of any of the afore-mentioned tables) and irrespective of whether measurements have been made in vacuo or in air or whether there has been any other variation in quantification between load port and discharge port, which shall be binding on and accepted by Insurers and the Assured for all purposes.

Alternatively, at the Assured's option, a comparison may be made of gross shipped and gross delivered weights or gross shipped and gross delivered volumes which shall be binding on and accepted by Insurers and the Assured for all purposes.

Where delivery is into automatically measured land tanks where it is not possible for tank figures to be independently checked by surveyors, the delivered quantities so ascertained shall be binding on Insurers and the Assured.

Should there be no Contract of Sale, claims shall be calculated on the basis of net weight or net volume (or gross weight or gross volume at the Assured's option) in accordance with the custom of the trade.

If a claim is to be filed for contamination, then in order to ascertain the measure of damage through contamination as provided for herein, a test or tests shall be made by a chemist approved by this Insurer.   With respect to such contamination losses, Underwriters shall be liable for the actual cost of reconditioning including all expenses incidental thereto which are necessary to bring the cargo back to its original condition, less, however, the normal expenses of refining in cases where the cargo was intended for refining.  Underwriters are also to pay for loss in weight and depreciation on such part of the cargo which could not be brought back to its original condition.  All such losses are payable irrespective of percentage.

All surveys and chemical analyses to be at the expense of the Insured except that in the event of loss, this Insurer shall be liable for the enhancement of the cost of surveys and/or analyses to determine the amount of the claim.

It is further understood and agreed that in the event the inspection warranties are not complied with a deductible of one percent (1%) shall be applied to all claims for shortage/leakage/loss in weight or volume and, in addition, for loss damage or expense caused by or resulting from contamination, in lieu of the previous stipulated one half (½%) of one percent for normal shortage/trade loss.

Basis of Valuation / Loss Settlement for LPG

**Sold Shipments:**
Valued at the Assured's sales invoice, including all charges in the invoice and including prepaid and/or advanced and/or guaranteed freight, if any.

**Unsold Shipments:**
If not contracted with a buyer, valued at the highest of:
Amount of Assured's purchase invoice including any freight not in the invoice, plus 10%, or the highest market value* at point of destination up to the date of arrival of carrying vessel or the date the vessel was due to arrive, plus 10 days excluding holidays and weekends.

(*) Note: Market value for the purposes of this insurance shall mean the market prices quoted by Platts Oilgram or a similar an accredited commodity publication or commodity exchange at or near the ports and/or place of insured destination.

And/or as may be declared prior to known loss.

# SECTION II - COAL, COKE AND PETROLEUM COKE

Coal, Coke and Petroleum Coke and similar goods in bulk are insured:

Coal, Coke and Petroleum Coke and similar goods in bulk are insured:

Against all risks of physical loss or damage irrespective of percentage, excepting those risks excluded by the FC&S and SR&CC Warranties appearing elsewhere in this policy, however excluding shortage and/or loss in weight and/ or difference in weight (or volume) unless caused by an FPA peril, however including heating and spontaneous combustion howsoever caused.

It is a condition of this insurance that

- The Assured provides the vessel master, or senior officer with the contract specifications of the cargo for moisture content, sulphur content and size as well as whether the cargo may emit methane or self heat.

- Assured uses reasonable due diligence to make ensure that the carrying vessel is IMO compliant as per current industry practice in the loading/stowage and handling of said commodities.

  Failure to comply with these conditions shall void the coverage extension for heating and spontaneous combustion.

# SECTION III – LIQUIDIFIED NATURAL GAS

Shipments of LNG in bulk is Insured:

Against all risks of physical loss or damage from any external cause, but excluding those risks excepted by the F.C. & S. and S.R. & C.C. Warranties, from time of leaving tanks at port of shipment and while in transit and/or awaiting transit and until safely delivered in tanks at destination, however including loss consequent upon delay arising from loss of or damage to or latent defect in the hull machinery and/or equipment of the carrying vessel by the perils set forth in Clause 6 (6.1, 6.2 & 6.3) of the Institute Time Clause as attached hereto.

This insurance also to pay the insured value of any materials lost from connecting pipelines, flexible or otherwise, in loading, transshipment or discharge into Cryogenic LNG Storage facilities.

Surveyor approved by these Assurers shall be notified and a survey made for purpose of checking, gauging/measurement of the loading and outturn volume of the cargo both into and from ship's tanks (meaning at loading and at discharge).

Claims recoverable hereunder shall be payable in excess of the customary Boil-Off calculation for a normal voyage, and in excess of any amount of product retained in the tanks to comply with the cooling requirements during Ballast voyage.

Basis of Valuation / Loss Settlement for LNG

**Sold Shipments:**
Valued at the Assured's sales invoice, including all charges in the invoice and including prepaid and/or advanced and/or guaranteed freight.

**Unsold Shipments:**
Valued at the highest market value at point of destination during the ocean voyage and subsequent storage, if any, up to the date of delivery to a third party customer, but not to be less than the Assured's purchase invoice including any freight not in the invoice, plus 10%.

In the event of a loss, it is agreed that applicable market price** will be determined at the Assured's liquidation price of their applicable commodity hedge for the concerned shipment 60 days after the date of loss, or at an earlier mutually agreed upon date between the Assured and these Insurers in order to mitigate the amount of loss. The date of loss shall be defined as the date of the report of the total loss of the vessel, or of the shipment or part of the shipment or of the disappearance of the vessel, or of the fact that the vessel is overdue at the port of destination. In the event the vessel is stranded or on fire, or in a collision, the date the Assured or their agents or representatives are so advised.

**Market price to be determined by pricing on the National Balance Point (UK Index) or the NYMEX/Henry Hub (USA) exchanges.

## LNG STORAGE AT CRYOGENIC/REGASIFICATION FACILITIES

In consideration of premium as agreed and notwithstanding anything to the contrary herein, including the Warehouse to Warehouse & Marine Extension Clause, the insurance provided under this policy is extended to cover Liquefied Natural Gas (LNG) while on premises of Marine Import LNG Storage facilities worldwide and during the Regasification process until delivered at the flange of the Natural Gas delivery pipeline system and it is further agreed that there will be no coverage hereunder after delivery into the Natural Gas transmission pipeline.

The duration of coverage hereunder shall be for a period not to exceed 180 days after discharge from the ocean vessel at such premises. It is agreed that the Assured will keep records of the length of time each shipment is stored at each facility and pay premium thereon at a rate of 0.01% per month or part thereof (including TRIA), on the highest market value of each specific parcel of LNG so stored.

Policy Ocean vessel transit limits to apply as per Clause 21 of this policy entitled LIMITS OF LIABILITY.

**Terms of Average:**

Against all risks of physical loss or damage from any external cause, but excluding those risks excepted by the F.C. & S. and S.R. & C.C. Warranties, however excluding all loss, damage or expense directly caused by the Regasification process.

Claims recoverable hereunder shall be payable in excess of the customary Boil-Off calculation based upon each storage facility and the nature of the Regasification process.

Above Basis of Valuation for LNG to apply under this policy extension.

## SECTION IV– PIPELINE RISKS

Pipeline risks shall be covered hereunder as per Bulk Oil Clauses Form SP13C as attached to this policy.

It is further understood and agreed that this insurance is to cover loss or and/or damage to the interests insured, whatsoever and irrespective of percentage, in consequence of explosion of or defects and/or failures to tanks, pipelines, taps, connections etc. as well as loss of and/or damage to the interests insured as a consequence of wrong or mistakenly opening or closing of taps, or by carrying our wrong connections and/or breakage of tubes, connection pipelines and/or similar connections.

### GENERAL CONDITIONS

24. **Loading Survey**

   It is understood and agreed that in respect of cargo purchased by the Assured afloat, the Assured's inability to comply with any loading/survey warranties mentioned herein will not in any way prejudice coverage hereunder. Nevertheless, the Assured will endeavor to ensure that all warranties have been carried out at loading and that the cargo was without damage prior to purchase.

   It is understood and agreed that if a warranty contained in this policy is breached due to circumstances beyond the control of the Assured or their agents, coverage hereunder shall not be prejudiced.

25. **Return Freight Cost (US Shipments Only)**

   This policy is extended to cover and reimburse to the Assured costs and expenses incurred to return the goods and/or merchandise to the port of shipment or transshipment or other ports elected by the Assured in the event the goods and/or merchandise may be found damaged and found unacceptable at the port of entry. Damage hereunder must be the result of a peril covered under this insurance.

   Warranted no claim arising out of rejection and/or condemnation and/or prohibition of entry arising solely out of error, omissions or default in document relating to this shipment.

   It is further warranted that the shipments be certified prior to shipment as to the satisfactory quality and condition by an approved surveyor or approved responsible party in the country of shipment.

26. **Perils Clause**

Touching the adventures and perils which this Company is contented to bear, and take upon itself, in this voyage, they are of the seas, fires, jettisons, assailing thieves, barratry of the Master and Mariners, and all other like perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said goods and merchandise, or any part thereof.

27. **Vermin Damage**

Including claims for loss, damage and/or expense caused by vermin not otherwise covered hereunder.

28. **Quarantine**

It is hereby agreed that this policy is extended subject to its terms and conditions to cover during quarantine at no additional premium.

29. **Sorting, Segregation, Etc.**

It is understood and agreed that where as a result of the operation of a peril insured against hereunder, sorting, segregation and/or examination expenses are reasonably incurred, Assurers agree to pay such charges in full, irrespective of the fact that part of, or all of the cargo may ultimately prove to be sound.

30. **Commingled Cargo (Other than raw sugar)**

When shipments in bulk insured hereunder are stowed in such a manner as to be commingled with other bulk shipments belonging to and/or insured by others or owned by the Assured but intended for different consignees, it is agreed that in the event of loss or damage caused by a peril insured against, such loss or damage shall be prorated in accordance with the respective interest (s) of the party or parties involved in the ratio that the quantity of product belonging to each party bears to the total quantity of product commingled.

31. **FPA (EC)**

Wherever FPA insuring conditions are specified for particular shipments under insuring conditions above the following wording shall apply:

Warranted Free from Particular Average unless the vessel or craft be stranded, sunk or burnt, but notwithstanding this warranty these Assurers are to pay any loss of or damage to the interest insured which may reasonably be attributed to fire, collision, or contact of the vessel and/or craft and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress, also including General Average and/or Salvage Charges.

32. **Sue & Labor Clause**

In case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard, and recovery of the said

goods and merchandise, or any part thereof, without prejudice to this insurance; to the charges whereof, this Company will contribute according to the rate and quantity of the sum hereby insured; nor shall the acts of the Assured or this Company, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment.

33.  **Recoopering**

In the event of containers being damaged in transit or arriving at destination in a damaged condition as a result of which it is necessary to recoop or provide replacement bags, Assurers will pay the costs of recoopering and/or the cost of the replacement bags. However, in no event shall the Assurers be liable for more than the insured value of the damaged interest.

34.  **Limited Rejection Coverage**

In the event of rejection and/or prohibition by a governmental body or authority only, it is agreed that this insurance shall pay up to 10% of the insured value of the interest involved, in respect to storage, transportation and any other consequent expenses and/or loss in value.

Warranted certified prior to shipment by a recognized authority as to satisfactory condition as required at country of origin and country of destination and all required valid permits/licenses are obtained.

35.  **Destruction Clause**

It is hereby understood and agreed that these Assurers will respond for the cost of necessary destruction and all expenses in connection therewith in accordance with government regulations and/or as agreed between the Assured and these Assurers of goods and/or merchandise damage by an insured peril.

36.  **Inchmaree Clause**

This insurance is also specially to cover any loss of or damage to the interest insured hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the Master, Mariners, Mates, Engineers or Pilots.

37.  **Explosion Clause**

The risks covered by this Policy are to include loss, damage or expense resulting from explosion, howsoever and wheresoever occurring, irrespective of percentage, but excluding the risks excepted by the FC&S and Strikes, Riots and Civil Commotions warranties, appearing elsewhere in this policy.

38.  **Fumigation Clause**

In the event of the vessel or other place being fumigated and direct loss or damage to Assured's merchandise results therefrom, this Company agrees to indemnify the

13

Assured for such loss or damage, and the Assured agrees to subrogate to this Company any recourse that they may have for recovery of such loss or damage from others.

39. **Shore Clause**

Where this insurance covers while on docks, wharves, or elsewhere on shore and/or during land transportation the applicable insurance conditions shall include the risks of fire, explosion, lightning, sprinkler leakage, aircraft damage, damage caused by falling objects, cyclone, hurricanes, tornadoes, windstorms, hail, landslide, earthquakes, volcanic eruption, flood, rising of navigable waters, collision, derailment, overturning or other accident or occurrence to the conveyance; and/or collapse and/or subsidence of docks, wharves or other structures.

40. **Warehousing, Forwarding Charges**

Notwithstanding any average warranty contained herein, this Company agrees to pay landing, warehousing, forwarding or other expenses and/or particular charges when they are incurred by reason of damage to the cargo or the vessel, conveyance or voyage being interrupted due to a peril insured against, or as a result of insolvency or financial default of the owners, charterers, managers, or operators of the vessel. Also to pay the insured value of any package, piece or unit totally lost in loading, transshipment and/or discharge.

Also to pay for any loss of or damage to the interest insured which may be reasonably attributed to discharge of cargo at port of distress.

41. **Craft Clause**

Including transits by craft and/or lighter to and from the vessel. Each craft and/or lighter to be deemed a separate insurance. Also to cover any special or supplementary lighterage. The Assured are not to be prejudiced by any agreement exempting lightermen from liability.

42. **General Average Clause**

A. General Average, Salvage and Special Charges, as per foreign custom, payable according to foreign statement, and/or per York-Antwerp Rules and/or in accordance with the contract of affreightment, if and as required; or, failing any provision in or there be no contract of affreightment, payable in accordance with the Laws and Usages of the Port of New York.

B. General Average Contributions, Salvage and Special Charges and Sue and Labor Charges will be payable in full, irrespective of insured and contributory values.

43. **Both to Blame Collision Clause**

Where goods are shipped under a Bill of Lading containing the so-called "Both to Blame Collision Clause" this Company agrees as to all losses covered by this

14

insurance, to indemnify the Assured for any amount (not exceeding the amount insured) which the Assured may be legally bound to pay to the shipowners under such clause.  In the event that such liability is asserted the Assured agrees to notify this Company who shall have the right, at their own cost and expense, to defend the Assured against such claim.

44.   **Carrier Clause**

Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

45.   **Negligence Clause**

The Assured is not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the bills of lading and/or charter party and/or contract of affreightment. The seaworthiness of the vessel as between the Assured and this Company is hereby admitted and the wrongful act or misconduct of the shipowner, charterer, their agents or servants causing a loss is not to defeat the recovery by an innocent Assured if the loss in the absence of such wrongful act or misconduct would have been a loss recoverable on the policy.  With leave to sail with or without pilots, to save or attempt saving life or property at sea, to tow and assist vessels or crafts in all situations, and to be towed.

46.   **Waiver and/or Release Clause**

Privilege is given the Assured to accept Contracts of Carriage, Charters and/or Bills of Lading and/or Receipts from common and/or contract carriers and/or owners and/or operators of tugs, barges and/or lighters and/or aircraft and/or conveyances (including terminals and/or warehouses) containing waivers and/or releases of liabilities. Privilege is also granted the Assured to execute railroad sidetrack agreements with or without a release of liability.

47.   **Fraudulent Bills of Lading**

This policy covers physical loss or damage through the acceptance by the Assured and/or Agents and/or shippers of fraudulent bills of lading and/or shipping receipts and/or messenger receipts and/or other shipping documents.  Also loss or damage caused by the utilization of legitimate bills of lading and/or other shipping documents without the authorization and/or consent of the Assured or its agents.

48.   **Machinery Clause**

On shipments of machinery or other products consisting when complete for sale or use of several parts, then in case of loss or damage covered by this insurance to any part of such machine or product, this Company shall be liable only for the proportion of the insured value of the part lost or damaged, or at the Assured's option, for the cost and expense, including labor and forwarding charges, of replacing or repairing the lost or damaged part or parts, and/or the repairing of the machine or product.

49. **Labels Clause**

In case of damage affecting labels, capsules or wrappers, this Company, if liable therefore under the terms of this Policy, shall not be liable for more than an amount sufficient to pay the cost of new labels, capsules or wrappers, and the cost of reconditioning the goods.

50. **Brand or Trademarks Clause**

In case of damage to goods bearing a Brand or Trademark, or the sale of which carries or implies a guarantee of the supplier or the Assured or the buyer under whose Brand or Trademark the goods have been shipped, the salvage value of such damaged goods shall be determined after the removal of all Brands or Trademarks. Contents in any containers on which the Brand or Trademark cannot be removed shall be transferred to plain bulk containers.

The cost of removing Brands or Trademarks shall be borne by these Assurers, but in no event shall these Assurers be liable for more than the insured value of the damaged goods.

51. **Control of Damaged Goods**

It is agreed that the Assured, exercising a reasonable discretion, shall be the sole judge as to whether the goods involved in any loss under the policy are suitable for marketing and no goods deemed by the Assured to be unfit for marketing shall be sold or otherwise disposed of except by the Assured or with the Assured's consent, but the Assured shall allow these Assurers any salvage obtained on any sale or other disposition of such goods.

52. **Concealed Damage**

With respect to shipments insured hereunder which are received at destination but not unpacked, this policy is extended to cover losses arising from perils insured against while in transit, which are not ascertained until the opening of the case and/or package and/or container and/or any other customary shipping unit, provided the opening of the unit occurs no later than ninety (90) days after arrival at destination. In absence of proof to the contrary, losses are to be considered as having occurred during the insured voyage.

Nothing contained herein, shall be construed to limit the coverage elsewhere provided herein.

Packages showing visible external evidence of damage are to be opened immediately upon arrival.

53. **Demurrage Charges**

If the Assured is directed to retain a container, trailer or rail car and if a late penalty and/or demurrage charge is assessed for the holding of the container, trailer or rail car past the return date, This Assurer will pay late penalties and demurrage charges until such time as This Assurer and The Assured agree that the container, trailer or rail car may be released.

16

54. **Debris Removal**

Where by reason of a peril insured against under this policy, extra expenses are incurred for the removal of all debris of the property covered hereunder or to destroy, dump or otherwise dispose of the damaged goods, or where extra expenses are incurred in discharging from the vessel and/or craft and/or conveyance, such expenses will be recoverable in full in addition to the damage to the insured interest, however, except that these Assurers shall not be liable under this clause for more than 10% percent of the insured value of the shipment or the amount in storage as that may relate to Endorsement 2 of this policy.

This clause does not provide coverage for any clean up expenses or other expenses for which the Assured may be liable solely as a result of a pollution statute.

55. **Extra Expense**

In the event of frustration, interruption and/or termination of the insured voyage from causes beyond the control of the Assured, this Policy will pay all extra expenses incurred by the Assured forwarding the goods to the original or substituted final destination.

56. **Expediting Expenses**

In the event of loss or damage, this Policy is extended to cover not only the cost or expense of replacing or duplicating the lost or damaged part or parts and/or repairing the machine or product, but also all expediting expenses to permit prompt and immediate replacement of lost or damaged material, including but not limited to, Air Express and/or Air Freight charges, overtime repair costs and other additional expenses, including duties, taxes and destination charges.

57. **Shipping Expense Clause**

When the subject matter insured is not delivered to the destination contemplated due to circumstances beyond the control of the Assured this insurance also to pay any charges incidental to shipping which have been or may be incurred by the Assured.

58. **Overdue Means of Conveyance**

If thirty days lapse after anticipated arrival of the carrying conveyance and no news has been received then the goods insured under this policy will be considered lost. Underwriters agree to pay the insured value of the missing items.

If the goods are located after the time limitation noted above the assured may still avail themselves of the protection afforded by the Brands and/or Labels and/or Control of Damaged Goods clause noted elsewhere in this policy.

Notwithstanding the above, in the event the goods are located in an undamaged condition the Assured has the option to accept the goods (returning underwriters payment less any Sue and Labor Expenses and/or Particular Charges), or assist underwriters in disposing of the goods. Said proceeds will be for the account of underwriters.

59. **Loading/Unloading**

This insurance is extended to cover goods and/or merchandise and/or property intended for shipment prior to dispatch during the loading process into containers, trailers or rail cars and continuing thereafter while they await commencement of transit and including after they arrive at final destination until they are promptly unloaded from containers, trailers or rail cars and throughout the unloading process, but not exceeding seven (7) days after arrival at final destination.

60. **Recoopering/Repacking**

In the event the packaging of the goods and/or merchandise and/or property insured under this policy is damaged due to a peril insured against, this Company will pay the reasonable cost of recoopering and/or the cost of new packaging even if at final destination if damage renders the insured goods unfit for shipment or distribution.

61. **Shortage from Container**

With respect to shipments of goods in containers, this Policy is also to pay for shortage of contents, meaning thereby the difference between (1) the number of packages or units loaded or said to be loaded in the container as per the shipper's or supplier's invoice or packing list and/or any other accepted document of the Assured's trade and/or business, and (2) the number of packages or units unloaded from the container by the Assured or consignee or their agent, notwithstanding the container seals may appear to be intact.

62. **Insufficiency of Packaging**

In the event of a claim being made for loss or damage which is alleged to be caused by insufficiency or unsuitability of packing or preparation of the subject matter insured, Assurers hereby agree that they will not use such alleged insufficiency or unsuitability as a defense against the claim in any case where the packing or preparation was carried out by a party other than the named Assured and the insufficiency or unsuitability arose entirely without the named Assured's privity or knowledge. For the purpose of this clause, "packing" shall be deemed to include stowage in a container or liftvan.

63. **Deliberate Damage - Pollution Hazard**

The Policy is extended to cover, but only while the property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under the Policy (subject to all of its terms, conditions and warranties) if the Property insured would have sustained physical loss or damage as a direct result of such accident or occurrence. This clause shall not increase the Limits of Liability provided for elsewhere herein.

64. **Customs Clause**

Notwithstanding anything contained herein to the contrary, it is hereby agreed that for shipments insured against "All Risks" hereunder this Insurance is extended to cover Physical Damage caused by the actions of customs agents in the course of their inspection duties.

65. **Duty**

This insurance also covers, subject to this policy's terms and conditions, the risk of partial loss by reason of perils insured against on the duties imposed on imported goods and insured hereunder, it being understood and agreed, however, that when the risk upon the goods continues beyond the time of landing from the overseas vessel, the increased value, consequent upon the payment of such duties, shall attach as an additional insurance upon the goods from the time such duty is paid or becomes due, to the extent of the amount thereof actually paid or payable.

Any limit of liability expressed in this Policy shall be applied separately to such increased value.

The Assured will, in all cases, use reasonable efforts to obtain abatement or refund of duties paid or claimed in respect of goods lost, damaged or destroyed. It is further agreed that the Assured shall, when this Company so elects, surrender the merchandise to the customs authorities and recover duties thereon as provided by law, in which event the claim under this Policy shall be only for a total loss of the merchandise so surrendered and expenses.

This insurance on duty and/or increased value shall terminate at the end of the import movement covered under this Policy (including the Warehouse to Warehouse & Marine Extension Clause) but nothing contained in these clauses, shall alter or affect any coverage granted elsewhere in the Policy during the storage or transit subsequent thereto.

66. **Other Insurance**

A. In case the Assured or others shall have effected any other insurance directly or indirectly upon the property insured, prior in day of date to the time of attachment of any specific risk hereunder, then this Company shall be liable only for the difference between the amount collected under such prior insurance and the amount that would be payable hereunder in the absence of such prior insurance.

B. In case of any other insurance upon the said property, subsequent in day of date to the time of attachment of any specific risk hereunder, this Company shall nevertheless be liable for the full extent of the sum by them insured upon the said risk without right to claim contribution from such subsequent insurance.

C. In case of other insurance upon the property insured hereunder, of date the same day as the time of attachment of any specific risk hereunder, shall be deemed simultaneous herewith and this Company shall not be liable for

more than a ratable contribution in the proportion that the sum insured by this Company bears to the aggregate of such simultaneous insurance but in the event of loss or damage by a peril insured against hereunder, which is not recoverable under such simultaneous insurance, this Company is to be liable for the entire loss, up to the amount insured hereunder.

D.   In case where any fire insurance or any other insurance including fire taken out by any carrier or bailee (other than the Assured) is available to the beneficiary of this Policy, or would be so available if this insurance did not exist, then this insurance shall be void to the extent that such other insurance is or would have been available; this insurance covering only the difference in conditions between the fire or any other insurance including fire and the coverage provided by the applicable terms and conditions of this policy.

E.   In any event, this Company shall receive and retain the premium payable under this policy and, in consideration thereof, shall guarantee the solvency of the companies and/or underwriters who issued such other insurance and the prompt collection of the loss thereunder but only to the same extent as this Company shall have been relieved of liability under the terms of this clause, but not exceeding, in any case, the amount which would have been collectable under this policy if such other insurance did not exist.

F.   In case of other insurance, these Assurers will advance the full amount of any loss payable hereunder, pending settlement of any distribution or difference with other insurers. The Assured agrees to use all reasonable means to collect the amount due from other insurers and reimburse these Assurers to the extent of the amount paid.

## PARAMOUNT WARRANTIES

The following Warranty(ies) shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon unless such other provision refers to the risks excluded by these Warranty(ies) and expressly assumes the said risks:

67. **FC&S Warranty (April 3, 1980)**

NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY THIS INSURANCE IS WARRANTED FREE FROM:

    A.    capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise;

    B.    all loss, damage or expense, whether in time of peace or war, caused by (i) any weapon of war employing atomic or nuclear fission and or fusion or other reaction or radioactive force or matter or (ii) any mine or torpedo;

    C.    all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, or with rockets or similar missiles, (other than weapons of war) or with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power, and for the purposes of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power;

    D.    the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom; or from the consequences of the imposition of martial law, military or usurped power; or piracy.

68. **SR&CC Warranty (April 3, 1980)**

NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THIS INSURANCE IS WARRANTED FREE FROM LOSS, DAMAGE OR EXPENSE CAUSED BY OR RESULTING FROM:

    A.    strikes, lockouts, labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrences or disorders,

    B.    vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological