UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREAT AMERICAN INS. CO., AXA INS. CO., : and CERTAIN UNDERWRITERS AT : LLOYD'S LONDON AND LONDON MARKET : COMPANIES, : : Plaintiffs/Counterclaim- : Defendants, : : v. : : CASTLETON COMMODITIES : INTERNATIONAL LLC and CASTLETON : COMMODITIES TRADING (CHINA) CO. : LTD., : : Defendants/Counterclaim- : Plaintiffs. : : | CIVIL ACTION NO.: 15-cv-03976 (JSR) |

## <u>DECLARATION OF MICHAEL FITZGERALD</u>

**MICHAEL FITZGERALD** duly deposes and says:

     1.     I make this Declaration based upon my personal knowledge, and I am competent to testify if called upon as a witness herein.

     2.     I have been retained as an expert in this matter by Counterclaim-Plaintiffs Castleton Commodities International LLC and Castleton Commodities Trading (China) Co. Ltd.

     3.     Attached hereto as Exhibit 1 is a true and correct copy of my expert disclosure in this matter and the exhibits thereto (Expert Disclosure).

4.      I made the Expert Disclosure based upon my personal knowledge, and am competent to testify if called upon as a witness herein.  I declare under penalty of perjury under the laws of the United States of America that the Expert Disclosure is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _November 6, 2015_
                          Date

_Michael T. Fitzgerald_

Michael Fitzgerald

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY OF NEW YORK and AXA INSURANCE COMPANY and CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND LONDON MARKET COMPANIES SUBSCRIBING TO POLICY NUMBER B0823MA1402182,<br><br>    Plaintiffs/Counterclaim-Defendants,<br><br>        v.<br><br>CASTLETON COMMODITIES INTERNATIONAL LLC and CASTLETON COMMODITIES TRADING (CHINA) CO. LTD.,<br><br>    Defendants/Counterclaim-Plaintiffs. | DOCKET NO.:<br>15 CV 03976 (JSR) |

## EXPERT WITNESS DISCLOSURE OF MICHAEL FITZGERALD

_Michael T. Fitzgerald_

MICHAEL T. FITZGERALD

## I.    RELEVANT EXPERIENCE

I have been retained by the Counterclaim-Plaintiffs Castleton Commodities International LLC and Castleton Commodities Trading (China) Co. Ltd ("CCI China") (collectively, "CCI" or "**The Assured**") in this matter to provide certain opinions with regard to CCI's insurance claim under primary and excess Marine Cargo/Storage & War Risks Policies (collectively, "**The Policy**") issued by Counterclaim-Defendant Insurers ("**The Insurers**"), at issue in this case.

I have more than 35 years of experience in the wet marine insurance industry.  My experience is principally in Ocean Cargo, Hull & Machinery (Hull), Protection & Indemnity (P&I) and Marine Liabilities. I also have extensive experience handling marine claims, including large and/or difficult claims.

As a marine broker I designed, marketed and serviced Builder's Risks, Ship Repairers, Charterer's, Wharfinger's/Landing Owner's, Bumbershoots, Offshore Packages, and Freight Forwarder coverages, including Air Cargo Legal, NVOCC, Warehousemen's Liability and Freight Forwarder's E&O insurance.

My first position was as a marine specialist with Johnson & Higgins in Minneapolis, which I joined in 1975.  In 1978, I joined Marsh & McLennan's (M&M) Dallas, Texas, office as a Marine Manager and was named Assistant Vice-President in 1980 and Vice-President in 1982. While with M&M I serviced all wet marine placements for the Dallas office.  In 1997 I joined Credit General Insurance Company as Marine Manager and Underwriter handling a book of business consisting principally of Texas and Louisiana offshore energy industry support vessel accounts as well as West Coast fishing vessels.

From 2000 to present I have worked for Allianz Global Corporate & Specialty as a Senior Underwriter handling Ocean Cargo, Hull, P&I and Marine Liabilities.

In the last 4 years, I have not testified as an expert at trial and have been deposed one time, in a case titled *Alaska Village Electric Cooperative v. Zurich American Insurance Co.,* No. 2:11-cv-01375-RAJ (W.D. Wash.).  In the last 10 years, I have not authored any publications.

## II.    COMPENSATION

My compensation for this case is $300 per hour for testifying and non-testifying services.

My compensation is not dependent on the outcome of this matter.

## III.    CLAIM BACKGROUND

My understanding of the relevant background is obtained from the materials reviewed as set out in Exhibit B, and generally is as follows:

CCI trades and markets various physical commodities, including but not limited to crude oil, fuel oil and other refined oil products, petrochemicals, natural gas and coal.

**The Insurers** issued to CCI a Marine Cargo/Storage & War Risks Policy covering the period from March 1, 2014 to March 1, 2015, with primary limits of $30 million and excess limits of

$190 million (**The Policy**).  **The Policy** provides "All Risks" coverage to CCI for, among other things, losses occurring during in-land storage.  **The Policy** insures CCI against all causes of loss subject only to limitations, exclusions and/or warranties specifically stated in **The Policy**.

It is my understanding that CCI China entered into Bitumen Product Purchase Agreements with its customers Hangzhou Leiteng Trading Co., Ltd. ("Leiteng") and Hangzhou Zhongjiao Bitumen Co., Ltd. ("Zhongjiao") (collectively, CCI's "Customers").  Under the Bitumen Product Purchase Agreements, CCI China entered into individual purchase and sales agreements with its Customers for the sale of bitumen product ("Sales Agreements").  CCI China purchased bitumen product, and the product was shipped to China and placed in temporary storage while awaiting payment from and delivery to its Customers.

CCI China entered into two Bitumen Freight Forwarding and Storage Facility Agreements (collectively, the "Storage Agreements").  CCI entered into a storage agreement with its customer Leiteng and Zhejiang Fukang Petrochemical Storage Co., Ltd. ("Fukang").  Separately, CCI also entered into a storage agreement with its customer Zhongjiao and Fukang.  Under the Storage Agreements, the parties agreed that CCI's bitumen product would be temporarily stored at a storage facility operated by Fukang in Jiaxing City, Zhejiang Province, China (the "Storage Facility").  It is my understanding that Zhejiang Jiayue Petrochemical Co., Ltd. ("Jiayue") is the parent company of Fukang.

During 2014, CCI delivered a total of 106,800.109 metric tons of bitumen to the Storage Facility. Approximately 19,398.447 metric tons of that bitumen was fully paid for and delivered to Leiteng.  As of September 26, 2014, CCI China understood and believed that 87,401.662 metric tons of bitumen was still being held in temporary storage awaiting full payment from and delivery to CCI's Customers.  This bitumen product had an approximate value of $61,603,383.00 based on the valuation provisions of the Sales Agreements.  On or about September 26-27, 2014 and thereafter, CCI was advised that its 87,401.662 metric tons of bitumen product delivered for temporary storage at the Storage Facility had been released to third parties, and not to CCI's Customers, at the direction of Jiayue without CCI's prior knowledge or authorization (the "Loss").

**The Policy** provides coverage for "all goods and/or merchandise and/or property of every description consisting principally of crude petroleum and refined petroleum products . . ." (Policy at ¶ 4.)  **The Policy** includes a "Commodities Insuring Conditions" clause, which insures against "All Risks" of physical loss or damage.  (Policy at ¶ 23.)  CCI's Policy was extended to provide temporary storage and/or in-land transit coverage per Endorsement 2.  Endorsement 2 incorporates the same broad "All Risks" insuring terms of **The Policy** by specifically referencing Clause 4 and Clause 23 (as amended by Endorsement 13) of the Policy and Bulk Oil Clauses Form SP-13C (at ¶ 7).  Endorsement 2 insures against storage risks outside the ordinary course of transit and storage risks not associated with transit.  **The Policy** covers all of CCI's goods and/or merchandise and/or property of every description "while temporarily stored in any location anywhere in the world."

3

Endorsement 2 contains the following exclusion (hereinafter referred to as the "Dishonest Acts Exclusion"):

> Loss or damage to goods and merchandise caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Assured or other party of interest, his or their employees or agents.

On May 22, 2015, **The Insurers** denied **The Assured's** (CCI's) Claim and initiated a lawsuit seeking a declaration under **The Policy** of no coverage for CCI's Claim based on application of the Dishonest Acts Exclusion.  According to **The Insurers**, under the terms of the Storage Agreements, Fukang acquired and/or was granted status:

- as an "other party of interest" under **The Policy** and/or
- as CCI's "agent"

and thus **The Insurers** assert that the Dishonest Acts Exclusion precludes coverage for CCI's Loss because it resulted from Fukang's conduct in allegedly "misappropriating" CCI's Goods Insured.

## IV.   OPINIONS

My opinions expressed herein are based upon my experience as outlined in Section I and my CV (attached as Exhibit A) and review of materials listed in Exhibit B.  My opinions are based upon insurance industry custom and practice and custom and usage with regard to the type of coverage involved in this matter.

### A.   The CCI Policy provides broad "All Risks" coverage

A review of **The Policy** shows it was written to *intentionally provide very broad coverage.*  **The Policy** insures against "All Risks" of physical loss or damage except those risks specifically excluded.

In addition to the basic insuring terms being the broadest available, **The Policy** also broadens coverage by lessening or eliminating policy limitations, exclusions and/or warranties (hereinafter referred to as "**exclusions**" or "**those risks specifically excluded**") in a number of ways (e.g., Clause 23 (as amended by Endorsement 13) and Clause 83).

### B.   Endorsement 2 extends coverage for temporary storage in any location around the world and storage risks outside the ordinary course of transit and/or not associated with ocean and related transit insured under the main body of The Policy

Endorsement 2 to **The Policy**, titled Storage & Inland Transit, extends **The Policy** coverage to Goods Insured "while temporarily stored in any location anywhere in the world," and insures against "storage risks outside the ordinary course of transit … and/or storage risks not associated with transit insured hereunder."  Coverage is provided per Clause 23 and the Bulk Oil Clauses Form SP13-C attached to **The Policy**, which provide coverage for "All Risks" except **those risks specifically excluded.**

4

Endorsement 2 covers all storage locations worldwide (on an any unnamed location basis), subject to a $30 million (primary) limit for any single storage location (with a $190 million excess limit).

In contrast to the broad (any unnamed location worldwide) storage coverage provided by **The Insurers** under Endorsement 2 of **The Policy**, storage coverage under Marine Cargo/Storage policies is often restricted:

    (i)     to Named locations only;
    (ii)    with Individual location limits;
    (iii)   with Unnamed locations being subject to a reduced location limit and CAT (earth movement, flood, windstorm) Peril exclusions or limitations; and
    (iv)   by Requiring recent (within the past 3 years) warehouse survey reports with full COPE (construction, occupancy, protection and environment) information and warranting all surveyor recommendations be complied with.

An example of such restrictive coverage is found in Great American's Warehouse and Processing Coverage Endorsement form GAI 2028. Form GAI 2028 provides storage (warehouse) coverage for only approved and scheduled locations, with each location being subject to specific and separate limits of liability, premiums and deductible amounts; and coverage being subject to exclusions and/or sublimits applying to loss or damage due to CAT Perils.

    **C.**    **The Insurers have the burden of proving that an exclusion to the "All Risks" coverage applies**

Per the "All Risks" insuring terms of **The Policy** in general and Endorsement 2 in particular, and as a matter of insurance industry custom and practice, a loss is covered unless the cause of loss is the subject of a specific policy **exclusion,** i.e., the cause of loss is specifically excluded.

Under "All Risks" coverage, in the event of a loss, the insurer has the burden of proving the loss is not a covered loss by proving the cause of loss is specifically excluded.

    **D.**    **Policy exclusions are construed and applied narrowly, so as to effectuate the broad scope of "All Risks" coverage purchased by an assured**

Insurance policies are contracts whereby insurers agree to accept risks and provide coverage on the basis of specified terms, conditions and exclusions. Insurers are in the business of evaluating, underwriting and accepting risks and are intimately familiar with the terms on which they will accept risks. In recognition of this fact, to the extent that the language of an insurance policy is

- Ambiguous and/or
- Contradictory

the policy needs to be interpreted in favor of the assured, providing the maximum possible coverage.

As a matter of insurance industry custom and practice, when an insurer seeks to invoke and apply a policy exclusion, the exclusion must be clear and unambiguous, with the interpretation and application of policy provisions to be in favor of the assured. The rationale for this approach as a matter of industry practice is to fulfill the basic purpose of the insurance policy, which is to provide the broadest coverage to the assured, and not allow the insurer to avoid coverage by broadly applying policy exclusions. When purchasing an "All Risks" policy, the expectation of the assured is that it is purchasing broad coverage for all risks except **those risks specifically** (and expressly) **excluded** by the insurer, stated in clear policy language.

As discussed in more detail in Section IV.F. below, it is clear in this case that the Dishonest Acts Exclusion was contained in Great American standard form policy endorsement 2028 at least as early as 2001. The custom and practice of construing policy exclusions narrowly and resolving ambiguities in favor of the assured therefore would reasonably apply to the Dishonest Acts Exclusion, which in my opinion is a standard exclusion that Great American has used in its policies for many years and which was incorporated into **The Policy** "as is," as opposed to being an exclusion drafted or created by Aon or negotiated by the parties.

E.     **In custom and practice, when a broker-provided form is used, the parties understand the intent is to provide broad coverage**

The wording of **The Policy** was provided by Aon, CCI's broker, for consideration and acceptance by **The Insurers**. The purpose of a broker provided policy is to get the assured the broadest possible coverage for the least amount of premium, but always subject to the insurers' review and acceptance of the proposed policy terms. And although the broker may propose and provide a policy for insurers' consideration, it is often the case that the terms will include various standard provisions created by insurers (which is true of the Dishonest Acts Exclusion wording of Endorsement 2 of **The Policy**).

In light of the broad insuring terms being requested, insurance companies carefully review and vet broker provided policy forms. When it comes to a broker provided policy form, it is common for an insurance company's vetting process/protocol to include mandatory review and sign off on the broker provided policy form by the insurance company's corporate legal department.

Insurance companies realize that when one of their underwriters agrees to and executes the Signature Page on a broker provided policy form the insurance company "owns" the policy. What I mean by "ownership" is that insurers are in the business of providing insurance and are intimately familiar with the terms and conditions of marine cargo and storage policies. When an insurance company agrees to provide coverage pursuant to a set of terms and conditions, the company is well aware of risks it is agreeing to accept and the basis on which it is providing coverage. This is particularly true as regards the Dishonest Acts Exclusion, which in my opinion reflects standard Great American language that would have been well known to the Great American underwriter.

As of the moment in time when the underwriters for Great American Insurance Company and for AXA Insurance Company executed the signature page of **The Policy** and Endorsement 2, as ocean cargo insurance professionals, they took full and complete ownership of **The Policy** and Endorsement 2. The same is true of the London Underwriters who agreed and accepted the terms of the Excess Policy.

F.   **Origin/Derivation of Policy Terms**

1.   **Insuring terms and conditions that are standard provisions of Marine Cargo/Storage policies and have a bearing on this case:**

a.   As evidenced by the following standard clauses, the  assured is only to be held responsible for those things within its control:

     i.   Negligence Clause (Clause 45)  -  vessel seaworthiness
     ii.   Waiver and/or Release Clause (46)
     iii.   Craft Clause (Clause 41)
     iv.   Insufficiency of Packaging (Clause 62)
     v.   Warehouse to Warehouse & Marine Extension Clause (Clause 80) Subpart G

b.   Carriers and bailees (and other third parties) who are entrusted to care for the Goods Insured intentionally are

     i.   **afforded NO coverage** under Marine Cargo/Storage Policies (Carrier Clause (Clause 44)

     ii.   subject to subrogation  -

- Subrogation Clause (Clause 93)
- Endorsement  2 "Storage & Inland Transit" Clause 1. "Conditions of Coverage" - Underwriters to be subrogated to the Assured's rights of recourse against any such third parties (i.e., owners and/or operators of storage locations)

2.   **The Dishonest Acts Exclusion in Endorsement 2 has been a part of Great American's standard storage endorsement wording going back to at least 2001**

Great American Warehouse Coverage Endorsement form GAI 2028 (ed. 4/20/2001) is a standard form of policy wording used by Great American well BEFORE **The Policy** was issued, containing the same Dishonest Acts Exclusion language as included in Endorsement 2 of **The Policy**.[1]   The edition date on this form reflects that it was put into use by Great American in April 2001, over a decade before **The Policy** was issued.  A later version of GAI 2028, titled Warehouse & Processing Coverage Endorsement and showing an edition date of "01 11" also contains a Dishonest Acts Exclusion that is identical to the one found in the Policy.

---

[1] GAI 2028 uses the term "Insured" in lieu of "Assured".

My opinion based on these facts (and in my experience in the insurance business) is that the Dishonest Acts Exclusion was not created by nor did it originate with Aon and it certainly is not unique to **The Policy**.   Instead, the Dishonest Acts Exclusion is a standard exclusion promulgated and used by Great American in its GAI 2028 Form endorsements dating back at least to 2001.   The Dishonest Acts Exclusion as contained in **The Policy** is the same as the exclusion in the GAIC 2028 standard forms, and in my opinion, the exclusion originated with and/or was created and promulgated by Great American rather than being the product of Aon's drafting or the result of negotiation between the parties.

### G.      Dishonest Acts Exclusion in Endorsement 2

#### 1.      The purpose/intent of a Dishonest Acts Exclusion is to avoid an insurer paying a loss under a policy to any party who committed the act causing the loss

As a matter of insurance industry custom and practice, property insurance policies (including Marine Cargo/Storage policies) never intend to pay for moral hazard losses – that is, losses deliberately caused by or at the direction of the policyholder/assured. Dishonest Acts Exclusions in Marine Cargo/Storage policies, for example as expressed in AIMU A/R 2004, in Banker's Endorsements and in Endorsement 2, are all intended to allow insurers to avoid paying for moral hazard losses deliberately caused by the policyholder/assured.   This concept is similar to a homeowner's policy, where the property underwriter should never have to pay for a fire loss when the fire was deliberately set by or at the direction of the homeowner policyholder/assured.

In keeping with the broad "All Risks" coverage under Endorsement 2, the Dishonest Acts Exclusion lists various conduct that is excluded.   All of this conduct shares a common principle – it all involves some form of deliberate, intentional, knowing, wrongful act.   By contrast, the exclusion would not, as a matter of custom and practice, be applied to situations where the loss is caused by or results from negligence or unintentional conduct.

Again in keeping with purpose and intent of the exclusion and industry custom and practice, the exclusion should not be applied unless the assured (in this case CCI or CCI China) is directly involved in or complicit in the wrongdoing, acting either alone or in concert with others.

This is evident by the fact that:

a.   The Basic Exclusions in AIMU cargo "All Risks" clauses[2] exclude

- Loss, damage, or expenses attributable to willful misconduct of the Assured.

b.   The Banker's (Interest) Endorsements in **The Policy** state:

---

[2] The American Institute of Marine Underwriters (AIMU) with over one hundred (100) years of servicing the United States ocean marine insurance industry is the recognized leader/authority in the U.S. as the information source of ocean marine insurance forms/insuring terms and conditions.   When reviewing **The Policy**, as a comparative benchmark, I referred to the following AIMU clauses/forms.
- American Institute Cargo Clauses 2004 All Risks form (AIMU) Cargo Clauses (A/R) January 1, 2004 (hereinafter referred to as AIMU A/R 2004)
- AIMU (Vessel) Classification Clause (May 19, 1993).

- it being especially agreed that the policy does not insure against conversion, misappropriation or other dishonest acts committed by or in behalf of **the named Assured.**

    **2.**    **Agency**

        **a.**    **The Dishonest Acts Exclusion applies only where the bad acts of an agent involve the agency – if the party is not acting in relation to the subject of the agency, the exclusion does not apply**

Where an "agent" of the assured is in some way involved in committing the wrongful/dishonest acts subject to the Dishonest Acts Exclusion, as a matter of industry custom and practice the exclusion would only apply if the acts of the "agent" were connected to the actual agency authority granted by the assured.

In this case, the Dishonest Acts Exclusion applies only to coverage for inland transit and storage of goods. Here, the loss at issue resulted from unauthorized release/redelivery to third parties of goods held in temporary storage subject to the coverage under Endorsement 2. So the Dishonest Acts Exclusion properly would apply only if and to the extent that CCI granted agency authority to Fukang with respect to the release and/or redelivery of the Goods Insured. CCI granted no release/redelivery authority to Fukang.

As the Work Contents/Requirements of the Storage Agreements reflect in multiple provisions, Fukang had no authority, let alone any agency authority, as respects the release or redelivery of bitumen product held in storage at the Fukang facility. The Work Contents/Requirements have many provisions requiring CCI's written consent or written instruction (as confirmed by CCI's authorized personnel or designated agent) before Fukang could take any action regarding release or redelivery of CCI's bitumen product.

Any conduct by Fukang involving customs declarations and/or inspections would not be related to the storage services, so the Dishonest Acts Exclusion would not apply even if Fukang acted as CCI's agent for customs declarations and/or inspections.

**The Assured's agent** is an extension of, and has the same authority as **The Assured**. On the other hand, a "third party owner and/or operator of a storage location" lacks authority to act on his sole discretion on behalf of **The Assured** and is clearly not **The Assured's agent**. This distinction between **The Assured's agent** and a "third party owner and/or operator of a storage location" is clearly evident in the wording of both

- The Storage Agreement between CCI and Fukang Clause 22. "Agent." and

- Endorsement 2 clause 1.

        **b.**    **The Storage Agreements reflect that Fukang is not CCI's agent**

Clause 22 "Agent" of the Storage Agreements provides:

9

In respect of Castleton's performance of its obligations under this Agreement, Castleton may, by written notice to Zhejiang Fukang, designate any employee, agent or contractor of any Affiliate of Castleton to act on Castleton's behalf (the "Agent"), whereupon Zhejiang Fukang shall act upon any instruction, request, notice or other communication from the Agent unless Zhejiang Fukang is reasonably satisfied that acting on the Agent's instruction, request, notice or other communication would present an objectionable risk to the efficient, safe or secure operation of the Zhejiang Fukang's Jiaxing Port 3rd Phase Terminal and/or the safety and security of persons at the Terminal.  Zhejiang Fukang may, using its reasonable judgment, verify and authenticate with Castleton any instruction, request, notice or other communication given by the Agent.

This provision makes clear that the parties did not consider or designate Fukang as CCI's agent for purposes of the Storage Agreement, but instead contemplated that CCI might designate or appoint some other party to be its agent.

It is abundantly clear that Fukang is NOT an agent of CCI as respects the release/redelivery of any of the Bitumen that was lost and is the subject of this claim.

### c. Endorsement 2 reflects that a third-party storage owner/operator like Fukang is not an agent

Clause 1.  "Conditions of Insurance" of the Storage & Inland Transit Endorsement No. 2 includes the following:

Notwithstanding the foregoing storage risks of coal and LNG at Regasification plants shall be insured as set forth within Clause 23 of this policy.

Warranties for All Coal and Coke products (steam, petroleum coke etc.):

1.  Warranted coal piles not to exceed 20 meters in height

2.  Warranted at the outset of storage risk the temperature of the coal piles not to exceed 50 degrees Celsius.

3.  Warranted the assured shall measure the temperature of the coal piles at various points in the coal stock on a regular basis and that the temperature shall not exceed 60 degrees Celsius.

                        *        *        *

In the event of coal storage at any third party owned or operated location(s) Underwriters agree to waive any such breach of warranty where it can be demonstrated by **the assured or their agents** (emphasis added) that written instructions detailing the above storage warranties were given to **such third party** (emphasis added) prior to the attachment of the storage risk hereunder.  Underwriters to be subrogated to **the Assured's** (emphasis added) rights of recourse against any **such third party**.

The wording used in Endorsement 2 Clause 1 clearly makes a distinction between **The Assured or their agents** on the one hand and **third party owners/operators of storage locations** on the other. An **agent of The Assured** is NOT a **third party owner/operator of a storage location** and likewise a **third party owner/operator of a storage location** is NOT an **agent of The Assured**.

These provisions in Endorsement 2 reflect that an **owner/operator of a third-party storage facility** is NOT considered to be an **"agent"** of The Assured for purposes of the storage coverage provided or for purposes of applying the Dishonest Acts Exclusion. Indeed, the **"assured or their agents"** are identified as separate and distinct from **"such third party"** (**such third party being the third-party owner/operator of the storage location**). Again, a **third-party storage facility owner/operator** is NOT an agent of The Assured (CCI). As such, the acts of Fukang (and/or Jiayue as Fukang's parent) cannot trigger the Dishonest Acts Exclusion.

<blockquote>

**d.    Other similar exclusions used by GAIC reflect that a third-party storage owner/ operator is not an agent or "other party of interest" for purposes of the Dishonest Acts Exclusion**

</blockquote>

Other GAIC standard policy forms[3] specifically exclude coverage based on dishonest acts etc. of a party to whom the insured "entrusts" property – that is the type of exclusion that could apply to a warehouseman, bailee, or storage facility operator like Fukang. But the CCI Policy does not have this language in the Dishonest Acts Exclusion, reflecting (consistent with insurance industry custom and practice) that the intent was not to exclude coverage based on acts of a third party storage facility owner/operator such as Fukang.

<blockquote>

**3.    Other Party of Interest**

**a.    "Other party of interest" means a party that is an assured or has an insurable interest under The Policy with respect to the Goods Insured**

</blockquote>

It is important to note that "other party of interest" refers back to **The Assured** – as in "**the Assured** or OTHER party of interest." Therefore **The Assured** is a "party of interest" and an "other party of interest" must be akin to **The Assured** – an other party that has an insurable interest under **The Policy** in the Goods Insured.

To be a "party of interest" or "other party of interest" one has to have an "Insurable Interest" (Clause 5) under **The Policy** in the "Goods Insured" (Clause 4). To have such an "Insurable Interest" in the Goods Insured being shipped (or stored) the party needs to have an ownership and/or financial interest in the Goods Insured and the right to make a claim under **The Policy** for a loss affecting that interest.

---

[3] For example, GAIC Miscellaneous Property Floater, form GAIC 2427 (Ed. 09 03).

b.     **Banker's endorsements are examples (Endorsements 9, 11 and 14)**

The several Banker's Endorsements are examples of situations where a party not falling within the definition of **The Assured** nevertheless has the right to make claims and receive payments under the Policy.  Where CCI arranges/secures financing from one or more banks in connection with purchase or sales contracts, the bank may require a Banker's Endorsement to protect the bank's financial interest in the Goods Insured.   Per a Banker's Endorsement **The Policy** recognizes a lending Bank's insurable/financial interest in the Goods Insured when the Goods Insured are offered as collateral for a loan.  These endorsements provide that the specified CCI lenders:

> will be recognized as the insured under this policy in connection with any loss or damage to such merchandise for which it shall hold warehouse receipts, bills of lading or other evidence of title or control or in the case of property not represented by such documents in which it shall have an insurable interest evidence by written entry on the records of the Bank, and that payment for any loss of or damage to such merchandise shall be made directly to the Bank only, to the extent of its insurable interest therein.

This is precisely the type of "other party of interest" to which the exclusion would apply – the bank has an insurable interest under **The Policy** (CCI's Policy) in the **Goods Insured**, and a recognized right to be insured by **The Policy**, and thus is a "party of interest" "other than" **The Assured** (CCI) as defined in **The Policy**.

c.     **The Policy Clause 4 Goods Insured and Clause 5 Insurable Interest extend cover to other parties who are not The Assured**

On shipment and storage risks**, The Policy** allows CCI as **The Assured** to place insurance on Goods Insured

- Where CCI is a party to the purchase or sales contract

    1. CCI buys/owns the Goods Insured – CCI places insurance as principal, for its own account.

    2. CCI has sold the Goods Insured to a customer and the customer requests CCI place coverage on the customer's behalf – CCI places insurance as agent, for others that have an insurable interest.

- And on shipment risks when CCI is not a party to the purchase or sales contract

    3. CCI places insurance as agent, for account of others (where the "other" party has an ownership and/or financial interest in the Goods Insured) from whom instructions to insure have been received by CCI prior to any reported loss, damage or accident.

These clauses provide additional examples of how the coverage under **The Policy** can be extended to parties who do not fall within the definition of Assured in **The Policy** but who

nonetheless can be afforded coverage under **The Policy** because they have an ownership or financial interest (i.e., an insurable interest) in the Goods Insured. These clauses extend insurance coverage under **The Policy** for goods of and shipments made by or for "the account of others" (i.e., not **The Assured**) where CCI (as **The Assured**) has received instructions to insure such goods/shipments. Again, such third parties do not fall within the definition of Assured.

Rather, based solely on said party having an insurable interest (ownership and/or financial) in the goods/shipments they can secure coverage under **The Policy** by giving written instructions/authorization to CCI to act as their agent in arranging coverage for and on their behalf and thereby achieve status as a "party of interest" or "other party of interest" under the **The Policy**. As such, these again would be a "party of interest" or "other party of interest" to which the Dishonest Acts Exclusion properly could be applied, as **The Insurers** would want to avoid a situation where a "party of interest" in goods/shipments covered by **The Policy** could cause a loss by acting dishonestly and then seek the benefit of the coverage provided by **The Policy**.

> **d.    Carriers and bailees are considered third parties as opposed to parties of interest**

**The Policy** has several provisions clearly stating that a bailee (such as Fukang) is not recognized as having any insurable interest under **The Policy**:

- Clause 44. "Carrier Clause": Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

- Clause 93. "Subrogation Clause": It is agreed that upon payment of any loss, damage or expense, this Company is to be subrogated to the rights of **The Assured**, to the extent of payment made, against any **carrier, bailee or other third party**, which may be liable for the loss.

These provisions of **The Policy** clearly reinforce and support my opinion that Fukang is NOT an "other party of interest" for purposes of the Dishonest Acts Exclusion, as **The Policy** expressly disclaims any insurable interest under **The Policy** on the part of a bailee such as Fukang.

My opinion is supported by the "entrustment"-type of language used by GAIC in the dishonest acts exclusion in its Miscellaneous Property Floater form GAI 2427 (Ed. 09 03). The exclusion applies to an "other party of interest" or "any persons to whom the property may be entrusted (carriers for hire excepted)." This demonstrates that a **bailee/warehouseman/storage facility owner and/or operator** is NOT an "other party of interest" because if a third-party's possession of **The Assured's** Goods Insured was enough to make a **storage facility owner and/or operator** an "other party of interest," there would be no need for the "entrustment" language of the exclusion.

Again, the inclusion of separate exclusion language for parties to whom the Goods Insured may be entrusted reflects that such parties are NOT, as a matter of custom and usage, considered "other parties of interest."

13

### e.    Storage Agreement Clause 9.3 does not make Fukang a "Party of Interest" or "Other Party of Interest"

The Storage Agreements between CCI, its Customers, and Fukang provide in relevant part:

Clause 9.  "Delivery, Re-Delivery, Risk and Title"

> 9.3 Risk to the Goods delivered at the Dedicated Facilities shall pass to Zhejiang Fukang at the time the Goods are delivered to Zhejiang Fukang (as determined in accordance with Clause 9.1), and shall pass to Castleton when the Goods are redelivered to Castleton (as determined in accordance with Clause 9.2).

> 9.4 The title to the Goods stored or in the physical possession of Zhejiang Fukang will at all times remain with Castleton, unless Castleton has transferred the title to the Goods to other parties.  Without the written notice of Castleton's authorized representative(s), Zhejiang Fukang shall not handle release of the Goods.

> Clause 10 Liabilities / Insurance

> 10.12 Zhejiang Fukang shall not be responsible for procuring insurance for the Goods in its custody.

> 10.13 Without limitation of Castleton's liabilities, Zhejiang Fukang shall at Castleton's request and at Castleton's expense assist Castleton to procure and maintain insurance for the Goods for the duration of this Agreement  .   .   .

Notwithstanding the provisions/wording of Clause 9.3, when read in conjunction with the provisions/wording of Clauses 9.4, 10.12 and 10.13 - title to the Goods, risk of loss and the responsibility of insuring the Goods at all times remained with CCI.  CCI did not request Fukang's assistance in procuring **The Policy** and CCI never agreed to place insurance on Fukang's behalf.  As such, in my opinion Fukang does not have any "insurable interest" under **The Policy** with respect to the bitumen stored at Fukang and therefore is not an "other party of interest" for purposes of the Dishonest Acts Exclusion.

I reserve the right to update, revise and otherwise supplement my report based on additional information that may become available.

14

# <u>EXHIBIT A</u>

# CURRICULUM VITAE

## MICHAEL T. FITZGERALD

Mr. Fitzgerald earned his Bachelor of Arts degree in economics from Macalester College in St. Paul, Minnesota, before embarking upon a career in the marine insurance industry.  He has more than 35 years of wet marine insurance experience both as a Marine Broker and Marine Company Underwriter handling principally Ocean Cargo, Hull & Machinery (Hull), and Protection & Indemnity (P&I).

In 1975, Mr. Fitzgerald started his insurance career in the Marine Department of Johnson & Higgins, Minneapolis.

In 1978, Mr. Fitzgerald joined Marsh & McLennan, Dallas as their Marine Manager, was named Assistant Vice President in 1980 and Vice President in 1982.

During his years as a Marine Broker:
- he designed, marketed and serviced a wide variety of wet marine insurance placements including Builder's Risks, Ship Repairers, Charterer's, Wharfinger's/Landing Owner's, Bumbershoots, Offshore Packages, and Freight Forwarder coverages, including Air Cargo Legal, Non Vessel Operating Common Carrier (NVOCC), Warehousemen's Liability and Freight Forwarder's E&O.
- he personally handled his clients' large and/or difficult marine claims.

In 1997, Mr. Fitzgerald made the move from Marine Broker to Marine Company Underwriter joining Credit General Insurance Company, Dallas as their Marine Underwriter/Manager handling a book of Hull, P&I and Marine Liabilities business.  The book of business consisted principally of:
- Texas and Louisiana Gulf of Mexico energy industry related vessel operations.
- U.S. West Coast fishing vessels.

From 2000 to the present, Mr. Fitzgerald has worked for Allianz Global Corporate & Specialty (AGCS) fka Fireman's Fund McGee Marine Underwriters in Dallas as a Senior Underwriter Ocean Marine handling Ocean Cargo, Hull, P&I, Yachts, Primary and Excess Marine Liabilities, Marinas, Docks & Piers, and Boat Dealers.

# **<u>EXHIBIT B</u>**

**<u>Materials Reviewed in the Preparation of This Report</u>**

**Pleadings and Discovery**

1. Counterclaim-Defendants' Complaint with Exhibits (CCI0034091-CCI0034285)

2. Counterclaim-Plaintiffs' Answer and Counterclaim (CCI0034635-CCI0084666)

3. Primary Insurers' First Set of Interrogatories

4. Counterclaim-Plaintiffs' Objections and Responses to Primary Insurers' Interrogatories

5. Excess Insurers' First Set of Interrogatories

6. Counterclaim-Plaintiffs' Objections and Responses to Excess Insurers' Interrogatories

7. Counterclaim-Plaintiffs' First Set of Interrogatories

8. Great American's Objections and Responses to Counterclaim-Defendants' First Set of Interrogatories

9. AXA's Objections and Responses to Counterclaim-Defendants' First Set of Interrogatories

10. Excess Insurers' Objections and Responses to Counterclaim-Defendants' First Set of Interrogatories

**Documents and Correspondence**

May 22, 2015 Primary Insurers' Denial Letter (CCI0034064-CCI0034067)

May 22, 2015 Excess Insurers' Denial Letter (CCI0034082-CCI0034084)

Storage Agreement (Leiteng) (Chinese) (CCI0008150-CCI0008175)

Storage Agreement (Leiteng) (English Translation) (CCI0008121-CCI0008149)

Storage Agreement (Zhongjiao) (Chinese) (CCI0008177-CCI0008194)

Storage Agreement (Zhongjiao) (English Translation) (CCI0008093-CCI0008120)

October 8, 2014 Inventory Statement issued by Fukang to CCI (Chinese) (CCI0008565)

October 8, 2014 Inventory Certificate issued by Fukang to CCI (English Translation) (CCI0011854)

October 29, 2014 GAIC Surveyor's Preliminary Report (CCI0025829-CCI0025833)

Mediation Order/Notarial Deed (CCI0059876-CCI0059880)

Performance Guarantee Provided by Jiayue (Chinese) (CCI0008055)

Performance Guarantee Provided by  Jiayue (English Translation)  (CCI0008054)

January 29, 2015 Higher Court Hearing Minutes (English Translation)
(CCI0000801-CCI0000823)

Marine Cargo/Storage & War Risks Policy (CCI0071854-CCI0071922)

Contract of Insurance (CCI0071923-CCI0071950)

Great American Warehouse Coverage Endorsement, GAI 2028 (Ed. 04/20/2001)

Great American Warehouse & Processing Coverage Endorsement: GAI 2028 (Ed. 01/11)

Great American Miscellaneous Property Floater, GAI 2427 (Ed. 09/03)

February 17, 2011 Email from David Arel to Anne Vier and Jay Drummond
(CCI0050252-CCI0050253)

December 14, 2011 Email from Robert Henry to Anne Vier (CCI0050254-CCI0050255)

February 16, 2012 Email from Robert Henry to Anne Vier (CCI0050234)

February 16, 2012 Email from Robert Henry to Anne Vier (CCI0050346)

February 20, 2012 Email from Anne Vier to Robert Henry (CCI0050278-CCI0050279)

February 28, 2012 Email from Robert Henry to Anne Vier (CCI0050258)

February 29, 2012 Email from Robert Henry to Anne Vier (CCI0050256-CCI0050257)

February 29, 2012 Email from Robert Henry to Anne Vier (CCI0050325)

March 02, 2012 Email from Robert Henry to Anne Vier (CCI0050294)

March 12, 2012 Email from Robert Henry to Anne Vier (CCI0050321-CCI0050324)

April 09, 2012 Email from Robert Henry to Anne Vier (CCI0050289-CCI0050291)

June 29, 2012 Email from Robert Henry to Anne Vier (CCI0050292)

July 13, 2012 Email from Robert Henry to Anne Vier (CCI0050276)

July 18, 2012 Email from Robert Henry to Anne Vier (CCI0050344)

August 02, 2012 Email from Robert Henry to Anne Vier and Noreen Graham
(CCI0050411-CCI0050412)

August 16, 2012 Email from Songhui Rong to Anne Vier and Mark Ma
(CCI0050239-CCI0050242)

August 24, 2012 Email from Robert Henry to Anne Vier (CCI0050237-CCI0050238)

September 6, 2012 email from Robert Henry to Anne Vier (CCI0050280-CCI0050288)

September 6, 2012 Email from Robert Henry to Anne Vier (CCI0050243-CCI0050251)

February 28, 2013 Email from Robert Henry to Anne Vier (CCI0050475-CCI0050477)

February 28, 2013 Email from Robert Henry to Anne Vier (CCI0050490-CCI0050491)

March 05, 2013 Email from Robert Henry to Anne Vier (CCI0050480)

March 08, 2013 Email from Robert Henry to Anne Vier (CCI0050455-CCI0050456)

March 14, 2013 Email from Robert Henry to Anne Vier (CCI0050474)

March 14, 2013 Email from Robert Henry to Anne Vier and Sandra Sepulveda (CCI0050484)

April 03, 2013 Email from Robert Henry to Anne Vier
(CCI0050413)

April 03, 2013 Email from Robert Henry to Anne Vier and Beth Drayer
(CCI0050418-CCI0050419)

April 03, 2013 Email from Robert Henry to Anne Vier and Beth Drayer
(CCI0050422-CCI0050424)

April 05, 2013 Email from Robert Henry to Anne Vier (CCI0050407)

April 23, 2013 Email from Robert Henry to Anne Vier  (CCI0050470-CCI0050471)

June 13, 2013 Email from Robert Henry to Anne Vier (CCI0050396-CCI0050401)

June 13, 2013 Email from Robert Henry to Anne Vier (CCI0050451-CCI0050452)

June 20, 2013 Email from Robert Henry to Anne Vier (CCI0050235-CCI0050236)

June 26, 2013 email from Robert Henry to Anne Vier (CCI0050168)

January 02, 2014 email from Duan Filipp to Anne Vier (CCI0050173)

January 02, 2014 email from Anne Vier to Aon (CCI0050167)

January 03, 2014 email from Gary Ladner to Anne Vier (CCI0050212-CCI0050213)

January 06, 2014 Email from Gary Ladner to Anne Vier (CCI0050203-CCI0050204)

January 06, 2014 Email from Anne Vier to Gary Ladner (CCI0050160-CCI0050166)

January 08, 2014 Email from Gary Ladner to Anne Vier; John OMahony; David Arel; and Gardner Heidrick (CCI0050205-CCI0050211)

January 8, 2014 Email from Gary Ladner to Anne Vier and David Arel (CCI0050214-CCI0050216)

August 21, 2014 Email from Gary Ladner to Anne Vier (CCI0050227-CCI0050229)

September 3, 2014 Email from Gary Ladner to Anne Vier and John Gambino (CCI0050224-CCI0050226)

September 26, 2014 Email from Gary Ladner to Anne Vier (CCI0050217-CCI0050223)

September 27, 2014 Email from Gary Ladner to Anne Vier (CCI0050230-CCI0050233)

October 1, 2014 email from Gary Ladner to Anne Vier (CCI0050176-CCI0050178)

November 03, 2014 Email from Anne Vier to Gary Ladner (CCI0050157)

November 4, 2014 Email from Anne Vier to Gary Ladner (CCI0050185-CCI0050188)

November 4, 2014 Email from Anne Vier to Gary Ladner (CCI0050189-CCI0050193)

November 13, 2014 email from Anne Vier to Gary Ladner (CCI0050183-CCI0050184)

November 21, 2014 email from Gary Ladner to Anne Vier (CCI0050182)

December 4, 2014 Email from Gary Ladner to Anne Vier (CCI00500195-CCI0050197)

December 18, 2014 Email from Gary Ladner to Anne Vier (CCI0050198)

January 07, 2015 email from Gia Lucchese to Anne Vier (CCI0050169)

January 07, 2015 Email from Gia Lucchese to Anne Vier (CCI0050135)

January 28, 2015 email from Gary Ladner to Noreen Graham and John Gambino (CCI0050201-CCI0050202)

February 12, 2015 Email from Gary Ladner to Anne Vier (CCI0050199-CCI0050200)

Notarized Statement by John Wang from Insurers' March 2015 Interview (CCI0050128)

Notarized Statement by Filippo Duan from Insurers' March 2015 Interview (CCI0050127)

LDHE Cargo Binder (CCI0050326-CCI0050343)

Email from Gia RE 3.13.13 to 3.1.2014 Ocean Air Cargo Final Audit Invoice (CCI0050135-CCI0050135)

2013 to 2014 CCI _ Marine Audit – Great American – Invoice (CCI0050136-CCI0050138)

September 26, 2014 Email from Anne Vier to Greg Murtaugh and Gary Ladner at Aon (CCI0010127)

October 1, 2014 Letter from Michael Osorio (GAIC) to Greg Murtaugh at Aon (CCI0009508-CCI0009509)

October 10, 2014 Email from Michael Osorio to Greg Murtaugh at Aon with preliminary report form GAIC's surveyor (CCI0025171-CCI0025176)

October 13, 2014 Letter from Dan Hines to Greg Murtaugh at Aon (CCI0011791-CCI00011793)

October 15, 2014 Letter from Aon to Dan Hines (CCI0032565-CCI0032567)

October 24, 2014 Letter from Dan Hines to Greg Murtaugh (CCI0012112-CCI0012114)

October 29, 2014 Letter from Dan Hines to Greg Murtaugh (CCI0007155-CCI0007157)

October 30, 2014 letter from Michael Osorio to Greg Murtuagh (CCI0062347-CCI0062350)

November 17, 2014 Letter from Michael Goldstein to Michael Osorio (CCI0011475-CCI0011478)

November 25, 2014 Letter from Michael Goldstein to Michael Osorio (CCI0011483-CCI0011485)

November 28, 2014 Letter from Michael Goldstein to Michael Osorio (CCI0033442-CCI0033443)

December 23, 2014 Email from Michael Osorio to Greg Murtaugh (CCI0011708-CCI0011709)

January 7, 2015 Letter from Michael Goldstein to Michael Osorio (CCI0054245-CCI0054249)

January 13, 2015 Letter from Michael Osorio to Greg Murtaugh (CCI0048932-CCI0048935)

January 26, 2015 Email from Michael Osorio to Greg Murtuagh (CCI0032569-CCI0032570)

January 27, 2015 Email from Carlton Clarke at AXA to Michael Goldstein (CCI0032778)

February 9, 2015 Letter from Michael Goldstein to Michael Osorio (CCI0054310-CCI0054316)

February 9, 2015 Letter from George Zackarkow to Michael Goldstein (CCI0054319-CCI0054323)

February 12, 2015 Letter from Benjamin Fleischner to Michael Goldstein (CCI0033779-CCI0033780)

February 23, 2015 Letter from John Shugrue to George Zackarkow (CCI54325-CCI00543332)

February 24, 2015 Letter from John Shugrue to Benjamin Fleischner (CCI0054334-CCI0054335)

February 27, 2015 Letter from John Shugrue to Zackarkow, Fleischner, and Stern (CCI0054337-CCI0054338)

March 11, 2015 Letter to John Shugrue from Benjamin Fleischner (CCI00333832)

March 11, 2015 Letter from John Shugrue to Zackarkow, Flieschner, and Stern (CCI0033828-CCI0033829)

March 13, 2015 Letter from John Shugrue to Zacharkow, Fleischner, and Stern with Settlement Agreement attached (CCI0054356-CCI0054365)

March 13, 2015 Email from Michael Osorio to Sarah Mullin Finn (CCI0033837-CCI0033841)

March 27, 2015 Email from George Zackarkow to John Shugrue (CCI0009387-CCI0009390)

April 1, 2015 Letter from Michael Goldstein to Osorio, Scally, Stern, and Fleischner (CCI0071978-CCI0071979)

April 2, 2015 Letter from John Shugrue to Zackarkow, Fleischner, and Stern (CCI0054435-CCI0054437)

April 10, 2015 Letter from Benjamin Fleischner to John Shugrue (CCI0033845)

April 13, 2015 Email from Jonathan Chernow to John Shugrue  (CCI0054387-CCI0054388)

April 17, 2015 Letter from George Zackarkow to John Shugrue (CCI0032928-CCI0032931)

April 20, 2015 Email from Jonathan Chernow to John Shugrue (CCI0050126)

April 23, 2015 Letter from Michael Goldstein to Greg Murtaugh (CCI0063026-CCI0063028)

April 29, 2015 Letter from George Zackarkow to John Shugrue (CCI0034030-CCI0034031)

May 4, 2015 Letter from John Shugrue to George Zackarkow (CCI0034055-CCI0034059)

May 12, 2015 Letter from John Shugrue to Benjamin Fleischner (CCI0034061-CCI0034062)

May 22, 2015 Letter from Michael Osorio to Greg Murtaugh (CCI0034064-CCI0034067)

May 22, 2015 Letter from Benjamin Fleischner to Greg Murtaugh (CCI0034082-CCI0034084)