UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
GREAT AMERICAN INSURANCE COMPANY      :
OF NEW YORK, AXA INSURANCE COMPANY,   :
and CERTAIN UNDERWRITERS AT LLOYD'S,  :
LONDON AND LONDON MARKET COMPANIES    :
SUBSCRIBING TO POLICY NUMBER          :
B0823MA1402182,                       :
                                      :        15 Civ. 3976
                                      :
        Plaintiffs,                   :
                                      :        OPINION
                                      :
        -v-                           :
                                      :
CASTLETON COMMODITIES INTERNATIONAL   :
LLC and CASTLETON COMMODITIES         :
TRADING (CHINA) CO. LTD.,             :
                                      :
        Defendants.                   :
-------------------------------------x

JED S. RAKOFF, U.S.D.J.

        On December 10, 2015, following full briefing and oral argument

on summary judgment motions filed by both sides in this case, the

Court denied the summary judgment motions filed by plaintiffs and by

defendants. See Order dated Dec. 10, 2015, Dkt. 93. This Opinion

lays out the reasons for those denials.

        On May 22, 2015, plaintiffs Great American Insurance Company of

New York ("Great American"), AXA Insurance Company ("AXA"), and

Certain Underwriters at Lloyd's, London and London Market Companies

Subscribing to Policy Number B0823MA1402182 ("Certain

Underwriters"), collectively, the "Insurers," filed suit against

defendants Castleton Commodities International LLC ("CCI") and

Castleton Commodities Trading (China) Co. Ltd. ("CCI China"),

collectively, the "Castleton defendants." See Complaint, Dkt. 1. The

1

Insurers sought a declaratory judgment that they had no obligation to cover defendants' claimed losses of over 87,000 metric tons of bitumen,[1] which were allegedly lost while being stored at a Chinese facility called Fukang. See Complaint ¶¶ 49, 60, 74. The Insurers alleged that the loss of bitumen fell under an exclusion in the insurance contract for dishonest acts, including misappropriation. See Complaint ¶¶ 67, 74; Goldstein Declaration, Exhibit A ("Marine Cargo/Storage & War Risk Policy), Dkt. 63-1, at CCI0071896. On June 26, 2015, defendants answered the complaint and counterclaimed for breach of the insurance contract, as well as bad faith in investigating and handling defendants' insurance claim. See Answer and Counterclaims, Dkt. 15. Defendants claimed that their covered loss had a value of more than $53 million. See Answer and Counterclaims, ¶ 74.

Months of discovery ensued, including extensive motion practice relating to each side's efforts to compel production of documents that, they claimed, had been improperly designated as privileged.[2]

---

[1] Bitumen is used in the manufacture of asphalt. See Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment ("Pl. 56.1"), Dkt. 58, ¶ 9; Counterclaim-Plaintiffs' Local Rule 56.1 Response and Objections to Counterclaim-Defendants' Statement of Material Facts in Support of Motion for Summary Judgment ("Defs. 56.1"), Dkt. 72, ¶ 9.

[2] Plaintiffs argue on the instant motion that defendants rely on declarations of in-house counsel whose records they refused to disclose, and so have now waived privilege pursuant to the "fairness doctrine." See Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment ("Pl. Opp. Br."), Dkt. 68, at 4-5. Defendants respond, inter alia, that the relevant information appeared in letters sent to the Insurers, and so defendants are making no offensive use of any privileged information. See Counterclaim-Plaintiffs' Reply Memorandum in Further Support of Their Motion for Summary Judgment ("Defs. Reply Br."), Dkt. 85, at 9-10. The Court sees no basis for denying or staying defendants' motion for summary judgment purely on the basis of plaintiffs' assertions about privilege, as plaintiffs urge, see Pl. Opp. Br. at 4. However, if, during trial, defendants

See Memorandum Order dated Oct. 15, 2015, Dkt. 33; Memorandum Order dated Nov. 2, 2015, Dkt. 45. On November 6, 2015, both sides filed cross-motions for summary judgment. Plaintiff Insurers[3] move for summary judgment declaring that defendant CCI (as distinct from co-defendant CCI China) has no cognizable claim and dismissing CCI from the action; declaring that there is no coverage for the Castleton defendants' claimed loss; and dismissing defendants' counterclaim with prejudice. See Plaintiffs Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56, Dkt. 49. The defendants move for partial summary judgment as to coverage for their loss and non-application of the "dishonest acts" exclusion, while leaving the damages to be determined at trial. See Defs. Br. at 1. On November 20, 2015, each side opposed the other's summary judgment motion, and on November 30, 2015, both sides replied. On December 3, 2015, the Court heard oral arguments on the motions, and on December 10, 2015, the Court issued a "bottom-line" ruling denying both sides' motions for summary judgment.[4]

---

introduce evidence that plaintiffs believe mandates further disclosure on defendants' part, the Court will adjudicate such disputes on an item-by-item basis.

[3] The Castleton defendants refer to themselves as the "Counterclaim-Plaintiffs" and to the Insurers as the "Counterclaim-Defendants." See, e.g., Counterclaim-Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment ("Defs. Br."), Dkt. 60. For simplicity's sake, the Court refers to the Insurers as the plaintiffs and the Castleton entities as the defendants.

[4] On November 29, 2015, plaintiffs, in lieu of filing a reply to defendants' counterstatement of material facts, submitted an "Objection to Defendant's Improper Counterstatement of Material Facts," in which they asked the Court to strike defendants' "improper and prolix statements." See Objection to Defendant's Improper Counterstatement of Material Facts, Dkt. 89. For the reasons stated at oral argument on December 3, 2015, see Transcript of Oral Argument dated Dec. 3, 2015 ("Tr."), Dkt. 95, at 22:12-24, the Court grants this motion and does not,

3

By way of background, in 2008, plaintiffs Great American and AXA issued to CCI's predecessor, Louis Dreyfus Hybridge Energy ("LDHE") a Marine Cargo/Storage & War Risks Policy. See Local Rule 56.1 Statement of Undisputed Facts in Support of Counterclaim-Plaintiff's Motion for Summary Judgment ("Defs. 56.1"), Dkt. 61, ¶ 9; Plaintiffs' Counterstatement of Material Facts in Opposition to Defendants' Motion for Partial Summary Judgment ("Pl. Opp. 56.1"), Dkt. 70, ¶ 9. CCI was substituted as the named insured effective December 31, 2012. See Defs. 56.1 ¶¶ 27-29; Pl. Opp. 56.1 ¶¶ 27-29. As of March 1, 2014, Great American and AXA charged CCI a flat premium of $250,000, and provided insurance coverage up to $30 million. See Defs. 56.1 ¶¶ 29, 55; Pl. Opp. 56.1, Dkt. 70, ¶¶ 29, 55.

Policy Endorsement No. 2 of the insurance policy, "Storage & Inland Transit," excludes certain losses from coverage, including "Loss or damage to goods and merchandise caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Assured or other party of interest, his or their employees or agents." See Pl. 56.1 ¶ 24; Defs. 56.1 ¶ 43; Goldstein Declaration, Exhibit A, at CCI0071896. The Court will refer to this exclusion as the "dishonest acts exclusion."

On or about March 1, 2012, co-plaintiff Certain Underwriters at Lloyd's London and London Market Companies issued an excess

---

therefore, rely on the additional facts asserted in defendants' counterstatement in deciding the instant summary judgment motions. Nonetheless, the Court is of the view that considering the stricken factual allegations would not materially affect the decision of the summary judgment motions.

insurance policy to CCI's predecessor, Louis Dreyfus Highbridge Energy. See Defs. 56.1 ¶ 26; Pl. Opp. 56.1 ¶ 26. The excess policy provided insurance coverage of $190 million above the $30 million limits provided by the primary policy. See Defs. 56.1 ¶ 30; Pl. Opp. ¶ 30; Goldstein Declaration, Exhibit B, Dkt. 63-2, at CCI0071928. The excess policy stated that it was "[s]ubject to all terms, clauses and conditions as per underlying insurance policy [Primary Policy No.] as far as applicable, including all amendments thereto with or without notice and follow all settlements absolutely." See Goldstein Declaration, Exhibit B, at CCI0071929; Defs. 56.1 ¶ 48; Pl. Opp. 56.1 ¶ 48.

In January 2014, CCI China[5] entered into certain agreements to sell bitumen to purchasers in China and store the bitumen in China. See Defs. 56.1 ¶¶ 61, 67; Pl. Opp. 56.1 ¶ 61; Qiuling Declaration, Exhibit 30, Dkt. 50-32, at CCI0011795; Pl. Opp. 56.1, Exhibit 4, Dkt. 70-4, at CCI0008124. Though various aspects of these agreements – even their English translations – are disputed by these litigious parties, the basic outline of the relevant contractual arrangements was as follows. CCI China entered into sales agreements with purchasers of bitumen in China, including Hangzhou Leiteng Trading Co., Ltd. ("Leiteng") and Hangzhou Zhongjiao Asphalt Co., Ltd.

---

[5] Defendants urge this Court to determine that CCI, as distinct from CCI China, has no claim under the insurance policy because CCI had no insurable interest in the bitumen at issue in this case. See Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Br."), Dkt. 57, at 4-5. However, the Court declines to remove CCI from the lawsuit. As the parent company of CCI China and the named insured, see Goldstein Declaration, Exhibit B, at CCI0071926, CCI is entitled to make a claim under the insurance policy.

("HZA"). See Defs. 56.1 ¶ 61; Pl. Opp. 56.1 ¶ 61. CCI China also

entered into three-party agreements with its customer (for example,

Leiteng) and a Chinese storage facility, Zhejiang Fukang

Petrochemical Storage Co., Ltd. ("Fukang"). See Defs. 56.1 ¶ 67; Pl.

56.1 ¶ 57. Under these agreements, CCI China and its bitumen

customer would jointly store the bitumen at Fukang. See Pl. 56.1 ¶

54; Defs. Opp. 56.1 ¶ 54; Pl. 56.1 Exhibit 46 (Deposition of CCI

China's Filippo Duan), Dkt. 58-46, at 90:9-12; Pl. Opp. 56.1,

Exhibit 4 (Plaintiffs' Translation of Three-Way Agreement with

Leiteng), Dkt. 70-4; Qiuling Declaration, Exhibit 30 (Defendants'

Translation of Three-Way Agreement with Leiteng), Dkt. 50-32. CCI

China's customers would pay Fukang for storing the bitumen (although

the parties dispute whether such payment was conditioned on Fukang's

making delivery of the bitumen to CCI China's customers). See Pl.

56.1 ¶ 106; Defs. Opp. 56.1 ¶ 106. According to a CCI Powerpoint

presentation attached to an email dated November 14, 2014, the

"three-party storage agreement [was] a unique arrangement in order

to legally reduce VAT on CCI China." See Pl. 56.1, Exhibit 14, Dkt.

58-14, at CCI0025338; see also Deposition of Filippo Duan, 95:10-

96:4. CCI retained title to its bitumen even while it was stored at

the Fukang facility. See Defs. 56.1 ¶ 71; Pl. Opp. 56.1 ¶ 71.

On or about September 26 or 27, 2014, CCI learned that

approximately 87,400 metric tons of its bitumen in storage at the

Fukang facility, for which CCI was awaiting payment, had been

released by Fukang. See Defs. 56.1 ¶ 80; Pl. Opp. 56.1 ¶ 80. On or

about September 27, 2014, CCI notified insurers of its loss. See Defs. 56.1 ¶ 83; Pl. Opp. 56.1 ¶ 83.[6] On October 17, 2014, CCI, through its insurance broker Aon Risk Services, Inc., submitted a document to the insurers alleging a recoverable loss of approximately $61,481,807 (before applicable deductions). See Defs. 56.1 ¶ 89; Pl. Opp. 56.1 ¶ 89; Goldstein Declaration, Exhibit D, Dkt. 63-4. On October 30, 2014, Great American wrote a letter to CCI, stating that it "and the other interested underwriters expressly reserve all of their rights under the policy, while they continue their investigation of the alleged bitumen loss." See Pl. 56.1, Exhibit 40, Dkt. 58-40; Goldstein Declaration, Exhibit E, Dkt. 63-5; Defs. 56.1 ¶ 91; Pl. 56.1 ¶ 125. This letter identified the dishonest acts exclusion as a possible bar to coverage. See id.

The Insurers and CCI then conducted investigations of the claim. Though the parties dispute several aspects of what these investigations revealed, see, e.g., Defs. 56.1 ¶ 86; Pl. Opp. 56.1 ¶ 86; Pl. 56.1 ¶ 129; Defs. Opp. 56.1 ¶ 129, it is undisputed that plaintiffs' investigation found that "CCI's bitumen was released by Fukang without CCI's knowledge, consent or authorization, but . . .

---

[6] Defendants state that on October 14, 2014, CCI China brought a civil lawsuit in China against Fukang and Jiayue, Fukang's parent company (see Pl. 56.1 ¶ 116, Defendants' Reply to Plaintiffs' Counterstatement of Material Facts in Opposition to Defendants' Motion for Partial Summary Judgment ("Defs. Reply 56.1"), ¶ 68), based on breach of contract for releasing CCI's bitumen from storage. See Defs. 56.1 ¶ 87. Plaintiffs deny this point, but they do not seem to deny the existence of a Chinese lawsuit so much as dispute defendants' reasons for bringing that lawsuit and claim that CCI withheld relevant documents. See Pl. Opp. 56.1 ¶ 87. Plaintiffs assert, for example, that "certain documents produced indicate the decision to sue was made to appease the local authorities." Pl. Opp. 56.1 ¶ 87. Regardless, the Court does not view the Chinese lawsuit as material to the denial of summary judgment to both sides.

could not determine to whom the bitumen was released," and the
Insurers "were unable to determine why, when or how CCI's bitumen
was released from the Pukang facility." Defs. 56.1 ¶ 103-04; Pl.
Opp. 56.1 ¶ 103-04. On April 23, 2015, CCI submitted a further proof
of loss, calculating CCI's loss as $61,603,383 before application of
deductions. See Defs. 56.1 ¶ 116; Pl. Opp. 56.1 ¶ 116; Goldstein
Declaration, Exhibit F, Dkt. 63-6. On May 22, 2015, the Insurers
denied CCI's claim based on the dishonest acts exclusion. See Defs.
56.1 ¶ 118; Pl. Opp. 56.1 ¶ 118. On the same date, the Insurers
filed their declaratory judgment action against CCI. See Complaint,
Dkt. 1.

Summary judgment is warranted only if "there is no genuine
issue as to any material fact and . . . the moving party is entitled
to a judgment as a matter of law." Celotex Corp. v. Catrett, 477
U.S. 317, 322 (1986). The Court must "construe all the evidence in
the light most favorable to the nonmoving party, drawing all
inferences and resolving all ambiguities in its favor." Amidon v.
Student Ass'n of State Univ. of New York at Albany, 508 F.3d 94, 98
(2d Cir. 2007).

In the context of insurance policy interpretation, the insured
"has the burden of establishing a prima facie case for recovery by
proving (1) the existence of an all-risk policy, (2) an insurable
interest in the subject of the insurance contract, and (3) the
fortuitous loss of the covered property." Int'l Multifoods Corp. v.
Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002). However,

"the insurer bears the burden of showing that an exclusion applies to exempt it from covering a claim." MBIA Inc. v. Fed. Ins. Co., 652 F.3d 152, 158 (2d Cir. 2011). Significantly, to "negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language [that] is subject to no other reasonable interpretation . . ." Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006). Further, under "New York insurance law, [t]he burden, a heavy one, is on the insurer, and [i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." Id.[7] In this case, plaintiff Insurers seek to establish that the dishonest acts exclusion applies. See Pl. Br. at 5. While the Court thinks it unlikely that plaintiffs will be able to establish the application of this exclusion in a manner that meets the standards for insurance contract interpretation, the Court cannot conclude at the summary judgment stage that there are undisputed facts that either preclude or mandate the exclusion's application.

As an initial matter, the parties raise the issue of choice of law. See, e.g., Pl. Br. at 2-3; Defs. Br. at 3-4 n.1. The Court will give effect to the excess policy's express choice of law clause

---

[7] For the reasons stated infra, the Court finds that New York law applies to both the primary and excess insurance contracts. However, in the Court's view, the cited principles of insurance contract interpretation do not depend on whether the Court applies New York law to the primary policy, as plaintiffs urge, see Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Br."), Dkt. 57, at 2-3, or Connecticut law, as defendants contend, see Defs. Br. at 3-4 n.1. See MBIA Inc., 652 F.3d at 158-59.

stating that New York law governs. See Goldstein Declaration,

Exhibit B, at CCI0071932. Furthermore, the Court finds that New York

law also governs the primary policy, which lacks such an express

choice-of-law clause. The Second Circuit has stated that

> Federal maritime law requires us to determine the scope
> and validity of the [marine insurance] policy provisions .
> . . and the consequences of breaching them by using state
> law . . . Under federal choice-of-law rules . . . this
> choice-of-law analysis should include an assessment of the
> following contacts: (1) any choice-of-law provision
> contained in the contract; (2) the place where the
> contract was negotiated, issued, and signed; (3) the place
> of performance; (4) the location of the subject matter of
> the contract; and (5) the domicile, residence,
> nationality, place of incorporation, and place of business
> of the parties.

Advani Enterprises, Inc. v. Underwriters at Lloyds, 140 F.3d 157,

162 (2d Cir. 1998) (citations and internal quotation marks omitted).

Here, the Court finds especially significant the fact that

CCI's insurance broker is Aon Risk Services, Northeast, Inc.'s New

York office, see Pl. 56.1 ¶ 10; Defs. Opp. 56.1 ¶ 10, and that Aon's

New York Marine Cargo Department placed the insurance policies at

issue with the plaintiff insurers, see Pl. 56.1 ¶ 11; Defs. Opp.

56.1 ¶ 11. Even if CCI's headquarters is in Connecticut, see Defs.

56.1 ¶ 59, that fact is not dispositive. See St. Paul Fire & Marine

Ins. Co. v. Novus Int'l, Inc., 2011 WL 6937593 at *5 (S.D.N.Y. Dec.

28, 2011) ("[a]lthough [the insured] itself is located in Missouri,

it relied entirely on its New York insurance broker, Marsh, to

manage its relationship with [insurers]. . . . this Court finds

application of New York law to be appropriate"), aff'd, 504 F. App'x

10

57 (2d Cir. 2012). The issue is, moreover, relatively immaterial, because, even though defendants contend, at least in their brief, that Connecticut law should govern the primary policy, see Defs. Br. at 3-4 n.1, they do not expressly identify any specific issue on which, in their view, the choice between Connecticut and New York law to govern the primary insurance policy would make a difference. See Tr. 41:15-18 (defendants' counsel stating "we don't dispute that the interpretation of the insurance policies is governed by New York law, perhaps Connecticut law with respect to the primary policy."). Therefore, while the Court finds that New York law governs the primary insurance policy in addition to the secondary insurance policy, the Court does not view this determination as dispositive of any essential issue in this case.

As to the law governing the three-way agreements between CCI China, its customers, and the Fukang storage facility, these agreements provide that they are to be governed by the law of the People's Republic of China. See, e.g., Qiuling Declaration, Exhibit 30, at CCI0011806; Pl. Opp. 56.1, Exhibit 4, at CCI008135. The Court is unwilling to conclude, therefore, that Chinese law is irrelevant to a determination of the relationship between CCI and Fukang as defined by these agreements. However, the interpretation of the insurance policies in this case – notably, of the term "agent" in the dishonest acts exclusion – remains a matter of U.S., and specifically New York, law. Most significantly, the Court is not convinced that any material aspect of this case depends on the

application of Chinese versus American law. See, e.g., Tr. 41:25-42:1 (defendants' counsel stating, in response to the Court's question of whether it mattered which law applied, "Ultimately, Your Honor, we think the result is the same.").

The Court now turns to the application of the dishonest acts exclusion in Endorsement No. 2, which, as noted above, reads as follows: "EXCLUSIONS; . . . Loss or damage to goods and merchandise caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Assured or other party of interest, his or their employees or agents." See Goldstein Declaration, Exhibit A. First, and most importantly, plaintiff Insurers argue that that Fukang was CCI China's "agent" within the meaning of the dishonest acts exclusion. See Pl. Br. at 8.[8]

"Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." Cabrera v. Jakabovitz, 24 F.3d 372, 386 (2d Cir. 1994), quoting Restatement (Second) of Agency § 1 cmt. b (1958). Here, plaintiffs claim that Fukang was CCI China's agent both for "freight forwarding" purposes – that is, to

---

[8] Plaintiffs also claim that CCI had a Commercial Crime Policy that it chose not to extend to insure the risk of a dishonest agent, such as Fukang. See Pl. Br. at 6-7. In the Court's view, even if the existence of alternative sources of insurance were relevant, which is doubtful, see Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co., 505 F.2d 989, 1002 (2d Cir. 1974), this point would not clearly cut in favor of plaintiffs, since it could suggest that the policy defendants actually purchased did cover dishonest acts. However, the Court does not take the Commercial Crime Policy issue to weigh materially in favor of either side's summary judgment motion.

receive the bitumen from the ocean vessel, clear it through customs, and pay customs duties – and for the purposes of making deliveries of CCI China's bitumen to CCI China's customers. See Pl. Br. at 8-9. Defendants respond – plausibly, in the Court's view - that the dishonest acts exclusion in Endorsement No. 2 applies only after CCI China's goods had been placed into storage. See Defs. Opp. Br. at 6-7. In particular, Endorsement No. 2, titled "Storage & Inland Transit," begins by stating: "In consideration of marine premium paid, as stated elsewhere herein, this policy is extended to cover goods and merchandise as per Clause 4 of this policy, while temporarily stored in any location anywhere in the world, and during subsequent Inland transit; subject to the following terms and conditions . . ." See Goldstein Declaration, Exhibit A (also Pl. 56.1, Exhibit 1) at CCI0071894. One of these "terms and conditions" is the dishonest acts exclusion at issue in the instant litigation. See id. at CCI0071896.

In the Court's view, this language indicates that the relevant issue is whether Fukang was CCI China's agent for the purposes of storage or inland transportation to CCI China's customers, and that any services that Fukang performed for CCI China as a "freight forwarder" prior to storage of the bitumen at the Fukang facility are not evidence of agency. At the very least, construing the evidence in the light most favorable to defendants, the Court cannot grant summary judgment to plaintiffs on the basis that Fukang was CCI's agent prior to storage of the bitumen at Fukang.

13

As to whether plaintiffs have even raised genuine disputes of material fact on this point, plaintiffs argue, for example, that the original draft of the three-party agreements contained a clause captioned "no agency," which was later deleted. See Pl. Br. at 13, citing Pl. 56.1, Exhibit 16, Dkt. 58-16, at CCI0050669; Pl. 56.1, Exhibit 4, at CCI0008135. Plaintiffs further contend that CCI's internal communications refer to Fukang as CCI China's freight forwarding agent, see Pl. Br. at 12-13, citing, e.g., Pl. 56.1, Exhibit 14, at CCI0025337. The Court doubts that these points and other evidence adduced by plaintiffs raises a reasonable dispute of material fact to counteract the language of Endorsement No. 2, which indicates that the dishonest acts exclusion applies to storage and subsequent inland transit. However, the Court has no need to definitively resolve the issue of whether Fukang was CCI China's agent for freight forwarding purposes, since it finds that there exists, however narrowly, a reasonable dispute of material fact as to whether Fukang was CCI China's agent for storage and delivery purposes.

Plaintiffs contend, for instance, that CCI China fully relied on Fukang to effect the physical delivery of bitumen to CCI China's customers, in accordance with CCI China's instructions. See Pl. Br. at 14, citing, e.g., Pl. 56.1, Exhibit 46 (Deposition of CCI China's Filippo Duan), at 52:17-20 ("I don't know where Leiteng [CCI China's customer] took delivery, I just know that once Leiteng had paid the full amount, that we would just tell Leiteng how many tons of goods

belong to Leiteng"); Pl. 56.1, Exhibit 49, Dkt. 58-49 (Deposition of CCI China's Summer Gao), at 16:17-21 ("We have goods stored at the Fukang storage [sic] Company and I would have some communication with him, including about goods clearing customs and the storage of some of our goods, and he would then accept our instructions and carry out the release of those goods."). Plaintiffs also cite language in the three-party agreements about the services that Fukang was to perform, such as "Services: Any or all operations carried out or to be carried out by Zhejiang Fukang in respect of the Goods, as specified in Schedule II or at the request of CCI and agreed by Zhejiang Fukang, and include operations incidental thereto, including but not limited to receiving, handling, storage and/or delivery of the Goods." See Pl. Br. at 15, citing, e.g., Pl. 56.1, Exhibit 4, Dkt. 70-4, at CCI0008123. Moreover, plaintiffs claim that CCI's purchase agreements with its customers Leiteng and HZA (distinct from the three-way agreements that included Fukang) referred to Fukang as CCI's "service agents." See Pl. Br. at 11.[9]

Defendants argue, by contrast, that Fukang was not authorized to, and did not actually, physically transport or deliver CCI China's bitumen, and did not serve as CCI's shipper's agent with respect to the bitumen. See Defs. Opp. Br. at 14. According to defendants, Fukang's role in the delivery of bitumen was solely to allow CCI China's customers to collect the bitumen at Fukang, after

---

[9] Defendants contest plaintiffs' translation, arguing that the term plaintiffs translate as "service agents" is correctly translated "service merchants" or "service providers." They also note that Fukang was not a party to the sales agreements with CCI China's customers. See Defs. Opp. Br. at 13.

the customers had paid and title had transferred to the customers. See id. Defendants note that the three-party agreements prohibited Fukang from releasing bitumen without CCI China's written consent. See Defs. Br. at 9; Pl. Opp. 56.1, Exhibit 5, Dkt. 70-5, at CCI008100 (plaintiffs' translation of three-way agreement with HZA) ("Without CCI's written notice of authorization, Zhejiang Fukang shall not release the Goods"); Qiuling Declaration, Exhibit 31, Dkt. 50-33, at CCI0008648 (defendants' translation of three-way agreement with HZA) ("Zhejiang Fukang shall not handle delivery formalities without a written notice of an authorized representative of [Castleton]"); see also Transcap Associates, Inc. v. Cigna Ins. Co., No. 99-cv-5292, 2001 WL 1104718, at *7 (N.D. Ill. Sept. 18, 2001) ("To read the dishonestly [sic] exclusion to exclude anyone and everyone to which Transcap granted a contractual right would render the policy a nullity."). Defendants further contend that the insurance policy distinguishes "agents," on the one hand, from storage owners or operators such as Fukang, on the other. See Defs. Br. at 8, citing Goldstein Declaration, Exhibit A, at CCI0071894, and that Fukang, as a warehouseman, was not an agent under Chinese law, see Defs. Br. at 10.

The Court agrees with plaintiffs that Fukang need not have released the bitumen in furtherance of its agency relationship with CCI China in order to be considered CCI China's agent for the purposes of storage and delivery. See Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment ("Pl.

Reply Br."), Dkt. 86, at 5. Indeed, even defendants do not seem to claim as much. See Defs. Reply Br. at 2-3. But there remain genuine disputes of material fact that, at the very least, preclude summary judgment in plaintiffs' favor on the question of whether Fukang misappropriated the bitumen in its capacity as CCI China's agent for the purposes of storage and delivery.

The Court sees it as a closer question whether summary judgment for defendants is warranted on this point, especially in light of insurers' burden to establish the application of the dishonest acts exclusion. However, construing all the evidence in the light most favorable to plaintiffs, the Court finds that plaintiffs have presented sufficient evidence to create a triable issue of material fact and, accordingly, denies summary judgment to defendants.

Moving beyond the agency question, plaintiff Insurers also contend that Fukang was an "other party of interest" within the meaning of the dishonest acts exclusion. See Pl. Br. at 21-23. Plaintiffs argue that this term should be construed broadly, to encompass "a party who has a financial interest with respect to the insured goods by virtue of being in a position relative to the goods as a result of the insured's decision to do business with that party." Pl. Br. at 20. Plaintiffs further claim that Fukang should be considered an "other party of interest" because it was a "critical part of CCI China's bitumen trade"; because it had physical custody and control of the bitumen; because it held the bitumen "jointly" for CCI China and its customers; because it had an

17

insurable interest in the bitumen and, in fact, insured the bitumen;
and because it had a fiscal interest in the transaction inasmuch as
it would be paid by CCI China's customers only after delivery of the
bitumen was completed. See Pl. Br. at 21-22.

Defendants counter that the term "other party of interest" has
a specific meaning in the ocean cargo marine insurance industry, and
this meaning does not include warehousemen and storage providers,
but rather is limited to "a party with an insurable interest under
the Policy in the goods insured." See Defs. Br. at 14, 16.
Defendants also argue that if the insurers had wished to exclude
coverage for dishonest acts by parties like Fukang, they could have
included language, which they inserted in a different policy form,
excluding coverage for dishonest acts by, among other parties, "any
persons to whom the property may be entrusted . . ." See id. at 15.
Defendants further note that CCI retained title to the bitumen while
it was in storage at Fukang (indeed, this is undisputed, see Defs.
56.1 ¶ 71; Pl. Opp. 56.1 ¶ 71). See Defs. Br. at 18. Further, the
parties dispute the relevance of "Bankers' Endorsements" and the
dishonest act exclusions contained therein. See Goldstein
Declaration, Exhibit A, at CCI0071911; Defs. Br. at 18; Pl. Reply
Br. at 9.

The Court regards plaintiffs' argument that Fukang counted as
an "other party of interest" as weaker than their claim that Fukang
was CCI China's agent for storage and delivery purposes. However,
the Court notes that whether Fukang counted as an "other party of

interest" depends significantly on the custom and policies of the
marine cargo insurance industry – a point on which the parties
reasonably disagree. Having found a reasonable dispute of material
fact with respect to whether Fukang was CCI China's agent for
storage and delivery purposes, the Court need not definitively
resolve the issue of whether there exists such a dispute with regard
to the issue of whether Fukang was an "other party of interest."

Similarly, the Court need not resolve the merits of defendants'
argument that plaintiffs cannot establish Fukang "misappropriated"
or "converted" the bitumen, or committed a "dishonest act," within
the meaning of the "dishonest acts" exclusion. See Defs. Br. at 19.
The Court sees it as doubtful that Fukang's actions do not fall
within the aforementioned terms of this exclusion. Under New York
law, "an agent who intermeddles with the property of his principal
beyond the extent of his authority, with the intent to use or
dispose of it so as to alter its condition or interfere with the
owner's dominion, is guilty of conversion. . . . Wrongful intent is
unnecessary." Filner v. Shapiro, 633 F.2d 139, 141 (2d Cir. 1980).
Even if defendants are correct that the insurers cannot establish
that Fukang "dishonestly" misappropriated CCI China's bitumen, see
Defs. Br. at 19, Fukang's actions could still fall within the ambit
of the policy exclusion. However, the Court recognizes that there is
some uncertainty regarding the exact nature of the events at Fukang.
See, e.g., Defs. 56.1 ¶¶ 103-04; Pl. Opp. 56.1 ¶¶ 103-04.
Ultimately, the Court need not decide if there is a genuine dispute

of material fact as to whether Fukang committed a

"misappropriation," "conversion," or other "dishonest act," since it

rests its denial of summary judgment on the issue of whether Fukang

was CCI China's "agent" for storage and delivery purposes.[10]

Defendants additionally claim that plaintiffs acted in bad

faith by prolonging the investigation and denying CCI's claim even

though their own investigation failed to show that CCI China's loss

was not covered. See Answer and Counterclaims, ¶¶ 77-87; Defs. Opp.

Br. at 23-24. In the Court's view, it is doubtful that there exists

an independent cause of action for bad faith denial of an insurance

claim under New York law. See, e.g., Hastings Dev., LLC v. Evanston

Ins. Co., No. 14 Civ. 6203, 2015 WL 6618634, at *17 (E.D.N.Y. Oct.

30, 2015) ("[A] host of courts have held that there is no separate,

generalized tort claim for bad faith denial of insurance in New

York," and collecting citations)(internal quotation marks omitted);

but see Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 80

(2d Cir. 2002) (citing, possibly as dicta, New York cases

recognizing a bad faith claim "in which an insurance company refuses

to settle a claim against the insured"). However, "consequential

damages resulting from a breach of the covenant of good faith and

---

[10] Defendants further argue that the Insurers cannot show Fukang "caused" CCI
China's loss while acting as CCI China's agent, within the meaning of the
dishonest acts exclusion ("loss or damage to goods and merchandise caused by or
resulting from misappropriation . . ."). See Defs. Br. at 11-12. Defendants claim,
for example, that any services Fukang performed as CCI China's agent for freight
forwarding purposes had terminated by the time the loss occurred. See id. at 12.
In the Court's view, the issue of whether Fukang "caused" CCI China's loss is
largely covered by the discussion of whether Fukang was CCI China's agent for
freight forwarding purposes, see supra. Since the Court need not decide whether
there exists a genuine dispute of material fact as to the freight forwarding
agency question, it takes the same position on defendants' causation argument.

fair dealing may be asserted in an insurance contract context."

Panasia Estates, Inc. v. Hudson Ins. Co., 10 N.Y.3d 200, 203 (2008);

see also Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York,

10 N.Y.3d 187, 194 (2008). At least for damages purposes, therefore,

the Court finds that there are genuine disputes of material fact as

to whether plaintiffs acted in bad faith in denying defendants'

insurance claim. See, e.g., Defs. 56.1 ¶¶ 85, 110; Pl. Opp. 56.1 ¶¶

85, 110.

For all of the foregoing reasons, the Court, by Order dated

December 10, 2015, denied both sides' motions for summary judgment.

Dated: New York, NY
       February 25, 2016                    JED S. RAKOFF, U.S.D.J.